ESTATE OF SPYROS P. SKOURAS, DECEASED, SPYROS S. SKOURAS, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Skouras v. Commissioner
Docket No. 475-76.
United States Tax Court
T.C. Memo 1982-620; 1982 Tax Ct. Memo LEXIS 124; 44 T.C.M. (CCH) 1496; T.C.M. (RIA) 82620; October 25, 1982. John J. Barrett,David Simon and Robert F. Ambrose, for the petitioner. Stanley J. Goldberg, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency of $3,853,445 in petitioner's Federal estate tax. Concessions having been made by the parties, the sole issue remaining is the fair market value as of the alternative valuation date of 37,500 *125 Class B shares of SMC Shipping Corporation stock, includible in decedent's gross estate by virtue of section 2036. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Decedent Spyros P. Skouras died on August 16, 1971. His son, Spyros S. Skouras, was named executor of his estate. At the time he filed the petition in this case, Spyros S. Skouras resided in Greewich, Connecticut. Prior to October 20, 1966, decedent, his son, Spyros S. Skouras, and his daughter-in-law, Barbara F. Skouras, together owned 69.71 percent of Admiralty Enterprises, Inc. ("Admiralty"), a holding company with three active subsidiaries: World Wide Tankers, Inc. ("World Wide"), Prudential Lines, Inc. (later renamed Prudential Steamship Company, Inc. and hereinafter referred to as "PSS") and The Skouras Lines, Inc. ("Skouras Lines"). Admiralty owned all the outstanding stock of World Wide, PSS and Skouras Lines, except for 32.5 percent of the outstanding Class *126 A shares of PSS, which were owned by decedent. PSS was then an operating company with five steamships in the U.S.-Mediterranean cargo trade. At all relevant times, Skouras Lines and World Wide each owned one tanker vessel on charter to others. In 1966, PSS was a subsidized United States-flag steamship company covered by an Operating Differential Subsidy Agreement with the United States Maritime Administration ("MarAd"). Under such agreements, subsidized carriers are 1) required to provide a stated level of regular service on specified trade routes, 2) limited in their power to declare dividends and engage in other financial transactions and 3) required to undertake a program of vessel replacement and construction of new United States-flag vessels to be built in United States shipyards. In return, subsidized carriers receive "operating differential subsidies" in amounts calculated to equalize the costs of crews' wages and certain other operating costs with those of foreign-flag competitors. MarAd regulations required such subsidized carriers to accumulate earnings for vessel replacement and working capital purposes. Unless earnings exceeded specified minimum net worth and working *127 capital requirements, and required vessel replacement deposits were being met, dividends could not be paid without special consent from MarAd. SMC Shipping Corporation ("SMC") was formed in October, 1966, in order to assist PSS in the financing of the construction of five replacement vessels pursuant to the latter corporation's operating differential subsidy agreement obligations. These five new vessels were to be of a radically new design known as Lighter Aboard Ship ("LASH"). A LASH vessel differs from the traditional break-bulk cargo ship in that the LASH ship carries a series of large, self-contained barges which may be loaded away from the LASH vessel (e.g., at a plant upstream on a navigable river) and then later floated or tugged out to the LASH vessel where the pre-loaded barge is placed aboard. PSS hoped that LASH vessels would be cheaper to operate than traditional vessels because the loading and unloading of LASH vessels was thought to take a much shorter time and require significantly fewer expensive dockworkers. PSS hoped to be first with LASH ships on the Mediterranean trade and to make the LASH design (on which World Wide indirectly held patent rights) the dominant *128 cargo vessel design of the 1970s. PSS did not have sufficient capital on hand to construct its new LASH vessels in 1966, so it sought construction financing in part through a construction differential subsidy provided by the United States and ship mortgages guaranteed by the United States under Title XI of the Merchant Marine Act of 1936, as amended. An additional $16.1 million loan was obtained jointly from Chase Manhattan Bank, N.A. and the Marine Midland Bank & Trust Company (the "banks"). It was in order to secure this $16.1 million loan that SMC was formed. The sole intended purpose of SMC was to hold the Admiralty stock of decedent, his son and his daughter-in-law and to hold decedent's minority interest in PSS Class A stock. SMC would thus possess full voting control of Admiralty. In return for his Admiralty and PSS stock and a small amount of cash which decedent contributed to SMC upon its creation, decedent received 75,720 Class A shares of SMC (held in joint tenancy with his son) and 37,500 Class B shares of SMC. For their respective contributions, decedent's son also received 20,750 Class B SMC shares and decedent's daughter-in-law received 17,470 Class B SMC shares. *129 The 37,500 Class B SMC shares held by petitioner constituted (not counting the Class A shares held in joint tenancy) a minority voting interest in SMC. Pursuant to the agreement establishing SMC, decedent and his son, acting jointly while both were alive, were empowered (and, following the death of the first of them to die, the survivor acting alone was empowered) to require all holders of Class B shares of SMC to join in any action taken by them (or the survivor) with respect to SMC or the Class B shares of SMC, including, without limitation, 1) the sale of all or part of such shares, 2) the pledge or hypothecation thereof to secure any loans made to or on behalf of SMC, Admiralty or any subsidiary, and 3) the reorganization of SMC or the disposition of all or any of SMC's assets, provided such holders were brought along on identical terms and conditions. At decedent's death, this power became vested solely in decedent's son. The SMC shares were legended to incorporate the restrictions on transferability and the other restrictions and terms of the agreement establishing SMC. No shares of SMC owned by any of the parties could be sold unless the selling shareholder received *130 a bona fide offer and gave an offer of sale on the same terms to SMC first and then to the other shareholders pro rata. The bank loaned $16.1 million to Admiralty only after SMC, decedent and decedent's son guaranteed the loan. Decedent's Class B shares in SMC were all held at his death in a trust created October 24, 1966. [2]
In 1968, the shipyard building the LASH ships for PSS began experiencing construction problems and delays. This in turn created great problems for Admiralty because that corporation was not itself in a healthy financial condition and was looking to early delivery of LASH vessels to remedy its problems. Delay in receiving LASH ships meant not only the loss of a competitive edge in being the first new technology (LASH ships faced competition in the form of another new technology, containerized ships), *131 but also meant cash flow problems for Admiralty, which had to pay large amounts of interest on its construction debts without any new revenues. The management of Admiralty then looked around for a quick source of new cash and a way to hedge its bets on the LASH technology. In December, 1969, it reached what its management thought was a solution to its problems by having PSS acquire all the stock of Gracer Lines, Inc. from W.R. Grace & Company. Grace Lines, Inc. (immediately renamed Prudential-Grace Lines, Inc. and hereinafter referred to as "PGL") had been a subsidized United States-flag steamship operator which provided service to Central and South American ports. PSS purchased the PGL stock for a stated price of $44,500,000. PGL's net book value (assets minus liabilities) immediately prior to the acqusition, per its unaudited balance sheet as of August 31, 1969, was $73,720,000. Of the $44.5 million purchase price, $35 million was financed by bank loans to PSS. As part of the arrangement for this $35 million loan, the $16.1 million credit agreement with Admiralty in connection with the LASH vessel construction program was canceled. PSS obtained from PGL itself the $9.5 *132 million cash balance of the purchase price of PGL stock in a contemporaneous transaction whereby PSS sold its vessels, and its LASH vessel and barge construction contracts, to PGL for $16,915,161 ($10 million in cash and the remainder in subordinated notes of PGL). PSS also sold its net working capital and other tangible assets to PGL for an aggregate cash price of $1,442,140, subject to subsequent readjustment. PSS was thus left after the transactions as merely a holding company. As a condition of its approval of the sale of PGL to PSS, MarAd required PSS to contribute to PGL's capital an unconditional $11.5 million letter of credit. By its terms the letter of credit was to continue until December 31, 1976, at which time MarAd had the right to require PGL to draw down on the letter to meet working capital levels required by law or the amount by which PGL's net worth had failed by that time to increase by $11.5 million, whichever was greater. Upon any draw down by PGL under the letter of credit, PSS (and not PGL) was required to repay to the banks the amount drawn down. Pursuant to the credit agreement executed at the time of PSS's acquisition of PGL: 1) all outstanding *133 shares of SMC, PSS, PGL, World Wide and Skouras Lines, and all shares of Admiralty owned by SMC, were pledged to secure the bank debt (the $35 million loan and $11.5 million letter of credit) under a pledge agreement among the banks and SMC, Admiralty, PSSPGL, World Wide, Skouras Lines, the decedent individually and as trustee, the decedent's son and the decedent's daughter-in-law; 2) SMC, Admiralty, the decedent and the decedent's son guaranteed the entire bank debt on which PSS was primarily liable; 3) the sale or other disposition of any of the capital assets of SMC or of any member of the SMC group (except the sale of PGL's then owned vessels for cash, or dispositions under then-existing agreements) was prohibited without prior approval of the banks; 4) the sale or other disposition of SMC stock which would cause decedent, his son, his daughter-in-law and specified related persons to hold, in the aggregate, less than 80 percent of the voting power of SMC, or the sale or other disposition by any SMC group member of stock of any subsidiary SMC group member, would constitute an event of default; and 5) payment of dividends by SMC, Admiralty or PSS was substantially restricted *134 as to amount so long as any bank debt was outstanding and prohibited entirely if an event of default existed. The acquisition of PGL soon proved to be more of a burden to the SMC group than a benefit. In the three years prior to the acquisition of PGL, the SMC consolidated group net income was as follows: Year
Net Income (Loss)
1967
$1,973,000 1968
(52,000)
1969
(467,000)
In 1970, however, the consolidated group reported a net loss of $5,666,000. That figure ballooned to $8,843,000 of net loss in 1971. Heavy losses were continuing in early 1972 prior to February 16, 1972. A combination of factors led to these large losses in 1970, 1971 and early 1972: First, PGL, SMC's main operating company, had attempted to continue the passenger and freight trade that had been carried on unprofitably for a decade by Grace Lines, Inc. Unfortunately, competition from airlines and other transatlantic passenger vessels (now converted to cruise ships) destroyed PGL's main passenger business, primarily centered in the Caribbean. In early 1971, PGL was forced to retire its two passenger liners, putting them permanently in "mothballs." (These liners, as with all PGL *135 vessels, could not be sold to foreign-flag carriers, without special Congressional action, prior to their reaching 25 years of age.) PGL also discontinued passenger operations on its four remaining combination freight and passenger vessels. Second, Grace Lines, Inc.'s two main cargo markets had been trade routes from the United States to Chile and the United States to Peru. Due in part to the rise of the Allende government in Chile and a leftist dictatorship in Peru, business from those markets dropped roughly 50 percent practically from the day PGL acquired Grace Lines, Inc. and continued at that depressed level through early 1972 and beyond. Third, during 1971, operations were disrupted by five major strikes, three by longshoremen and two by seagoing personnel. The industry-wide longshoremen strikes had a material adverse effect on West Coast operations for over three months, July 1 through October 12, 1971, and on the East Coast for two months, October 1 through November 26, 1971. Because of scheduling difficulties and the effect on shippers of the uncertainty of scheduled service, the impact on operations was felt well beyond the actual length of the strikes. Two of *136 the company's vessels were also tied up by unlicensed personnel for six months until a favorable National Labor Relations Board ruling was obtained, which generally permitted the free transfer of vessels between coasts without union interference. The West Coast longshoremen resumed their strike on January 17, 1972, and this strike was ongoing on February 16, 1972. In late 1970 and early 1971, PGL took delivery of three of the five contracted-for LASH vessels and deployed them in its Mediterranean trade. This precipitated a general tie-up of the company's East Coast fleet during January and February, 1971, by the longshoremen, and thereafter by the masters, mates and pilots, while terms of LASH working arrangements were negotiated. PGL had counted on lower dock labor costs resulting from fewer man-hours needed for loading and unloading to make the LASH system the profitable technology of the future. Container ships, the competing technology which had preceded LASH in their introduction, had received favorable treatment from the longshoremen's unions. The International Longshoremen's Association, however, insisted on manning crews for loading and unloading each LASH barge *137 at nearly the same level required to load an entire break-bulk ship. The result was that PGL was saddled with a contract requiring it to pay for five times the labor LASH ships actually needed to load and unload their barges. This contract was entered into February 15, 1982. The contract made LASH ships, already suffering the disadvantage of being the second new technology in the Mediterranean, essentially uncompetitive with container ships. In the long haul, without a change in the union contracts the LASH ships would have to be converted at a substantial cost to container technology to be useful. As of February 16, 1972, PGL owned a total of 22 ships, including 16 cargo ships: five C3 general cargo ships built during World War II and at the end of their useful lives; eight C4 general cargo vessels built in 1966 and 1967; and three C8 LASH ships. PGL also had four C4 combination passenger and general cargo vessels built in 1963 and 1964, and the two passenger liners, in mothballs. The gross book value of PGL's vessels on that date was $124,395,641.58, before mortgages. The appraised value of those ships was between $95 and $99 million. PGL's property other than vessels included *138 containers and other shipping property and construction contracts for the two LASH vessels then in construction (against which PGL had incurred construction mortgage indebtedness). As of December 31, 1971, PGL's current liabilities exceeded current assets. While PGL was the main operating company of SMC, it was not the sole operating company. On February 16, 1972, World Wide owned a 32,000 deadweight ton tanker built in 1959 which was operating under an unprofitable long-term consecutive voyage charter agreement with the United States Navy Military Sea Transportation Service. World Wide experienced net losses between 1968 and 1971, inclusive. As of December 31, 1971, World Wide's book value (assets minus liabilities) was $191,534 and its current liabilities exceeded its current assets. In addition, the appraised value of its tanker was approximately $1 million less than its roughly $6 million book value. On February 16, 1972, Skouras Lines owned a 32,000 deadweight ton tanker built in 1958. The tanker was on long-term bareboat charter to Exxon Corp. at a charter hire of $900,000 per year. The charter was scheduled to terminate in 1979. The book and appraised values of *139 this tanker were similar to those of the World Wide tanker. Skouras Lines was considerably healthier than World Wide, the former having generated positive cash flows in 1968, 1969 and 1970. As of December 31, 1971, the net book value of Skouras Lines was $908,984. However, its current liabilities exceeded its current assets. In the period between PSS's acquisition of PGL and February 16, 1972, PGL had, with MarAd approval, pledged its $11.5 million letter of credit to secure an aggregate of $9.4 million of further loans advanced by the banks to PGL on a demand basis to provide operating cash needed as a result of continuing PGL losses. Application of the letter of credit to satisfy these loans would have given rise to an additional liability of PSS to the banks of $9.4 million, thus increasing PSS's total outstanding bank liability to $44,400,000 as of February 16, 1972. [3]
On March 18, 1971, PSS defaulted on the principal installment payment coming due on its bank debt. The terms of PSS's credit agreement with the banks were thereafter amended to defer *140 the due date of the first installment of principal until June 18, 1972. At the same time, the credit agreement was further amended to provide that a failure by PGL at least to break even in 1971 would constitute an event of default by PSS. In 1971, PGL incurred a net loss of $7,501,720. Accordingly, on January 1, 1972, PSS went into default on the bank debt as a result of its failure to at least break even in 1971. From and after that date, pursuant to PSS's pledge agreement, the banks had the right to accelerate at will payment of the entire bank debt and to foreclose on all collateral pledged to secure the debt. As of December 31, 1971, there was an $8,142,000 deficit in Admiralty and its subsidiaries' consolidated working capital (current assets less current liabilities). Admiralty's net book value at the end of 1969, 1970 and 1971 was $5,135,000, $1,205,000 and negative $7,030,000, respectively, indicating steady deterioration. Admiralty's net asset value on December 31, 1971, after adjustments to its books to reflect actual market values, was between negative $14.5 million and negative $17.9 million. The consolidated balance sheet of Admiralty and its subsidiaries *141 on December 31, 1971, was as follows (all dollar figures in thousands): Assets
Current Assets: Cash
$ 796
Cash on deposit for payment of mortgages
or otherwise restricted
312
Accounts receivable
30,385
Prepaid expenses and inventories
3,292
Deferred income tax
2,218
37,003
Less estimated deposits to be made
into statutory reserve funds
172
Total Current Assets
36,831
Fixed Assets: Vessels less depreciation $55,176
127,324
Other shipping property less
depreciation $8,084
2,227
LASH vessels under construction
20,754
150,305
Statutory Funds: Statutory reserve funds, net
326
Escrow and construction funds
9,369
9,695
Other Assets: Pledged as collateral: Investment in LASH Systems, Inc.
116
Non-interest time deposits
1,206
Marketable securities, at cost
(market value $211)
154
Deferred income tax
2,199
Other
5,444
9,119
205,950
Less Excess of Equity Acquired Over
Cost of PGL Stock
11,803
Total Assets
$194,147
Liabilities and Capital
Current Liabilities: Notes payable - banks
$ 13,251 Accounts payable and accruals
25,456 Mortgages payable, current
1,176 Estimated cargo and injury claims
4,332 Reserve for discontinued operations
758 Total Current Liabilities
44,973 Voyages in Progress - excess of
revenue over expenses
2,622 Long Term Debt: Notes payable - banks
31,250 Other notes, mortgages and loans
payable
105,758 137,008 Other Liabilities: Vessel construction costs - payable
from statutory funds
8,219 Accounts payable
427 Estimated cargo and injury claims
4,635 Deferred income tax
2,591 Reserve for discontinued operations
702 16,574 Capital: Preferred stock
6 Common stock
91 Capital surplus
1,339 Retained earnings (deficit)
(8,249)
Less treasury stock
(217)
(7,030)
$194,147 *142 The consolidated income and retained earnings statement of Admiralty and its subsidiaries on December 31, 1971, was as follows (all dollar figures in thousands): Terminated Voyage Results: Revenue
$ 86,091 Expenses, excluding depreciation
93,629 (7,538)
Operating differential subsidy
21,290 Voyage Results
13,752 Expenses: Administrative, general and advertising
11,086 Interest and other financial expense
7,844 Interest income
(309)
Depreciation of vessels, containers,
chassis, equipment and barge rentals
6,607 Amortization of excess of equity
acquired over cost of PGL stock
(1,078)
Other expenses, net of other income
151 Provision for U.S. and foreign income
taxes (credit)
(1,562)
22,739 Income (Loss) Before Extraordinary
Items
(8,987)
Extraordinary Item - Net Gain on Vessel
Sales
144 Net Income (Loss)
(8,843)
Retained Earnings (Deficit) At Beginning
of Year: As previously reported
(16)
Adjustments
610 As restated
594 Dividends Paid 1971
Retained Earnings (Deficit) At End of Year
$ (8,249)
For estate tax purposes, the gross estate of decedent, not counting the value of his *143 37,500 Class B shares of SMC stock, was negative on February 16, 1972. The net worth of decedent's son on that date was less than $1 million. The period 1969-71 was a poor one for the United States subsidized liner industry, as a result of radically increased capacity, severe rate competition and strikes of longshoremen and sea-going personnel (particularly in 1971). The United States economy appeared to be recovering from a recession in early 1972 and major strikes afflicting the steamship business had ended for the moment. Accordingly, some improvement in industry profit performance could be expected as of February 16, 1972, though the outlook for the industry was still speculative and on the whole negative. The Class B shares of SMC are closely held and no quoted market for the stock exists. None of the securities issued by SMC were, on February 16, 1972, or at any time before, registered with the Securities and Exchange Commission, or publicly traded. In the estate tax return, petitioner reported no value for the 37,500 Class B shares of SMC includible in decedent's gross estate. On Schedule K of the estate tax return, petitioner reported the estate's potential liability *144 on decedent's guarantees of the PSS bank debt, but stated the amount of such guarantees to be "undetermined." In his statutory notice of deficiency, respondent determined the fair market value of decedent's 37,500 Class B SMC shares to be $5,883,518 and increased the gross estate accordingly. ULTIMATE FINDING OF FACT The fair market value of the 37,500 Class B shares of SMC includible in decedent's gross estate was $10,000 on February 16, 1972. OPINION This case involves the valuation of certain shares of stock in a holding corporation whose operating subsidiaries were ailing shipping companies. Decedent died on August 16, 1971. Pursuant to the election of his executor, the shares (includible in the decedent's gorss estate by virtue of section 2036) are to be valued as of the alternate valuation date, February 16, 1972. See section 2032.
For purposes of section 2031, "Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge *145 of relevant facts." Section 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright,411 U.S. 546 (1973). When valuing stock, ordinarily fair market value may be determined by reference to actual selling prices or bid and asked prices on or near the appropriate valuation date. Section 20.2031-2(b), (c) and (d), Estate Tax Regs. Where, as here, the stock is in a closely held corporation for which no ready market or representative bid and asked prices exist, fair market value is to be determined based upon the company's net worth, prospective earning power, dividend-paying capacity and other relevant factors. Section 20.2031-2(f), Estate Tax Regs. Among these other relevant factors are goodwill; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. "However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the *146 facts of each case." Section 20.2031-2(f), Estate Tax Regs.; see also Rev. Rul. 59-60, 1959-1 C.B. 237, on which both parties rely. The instant case presents an even more difficult circumstance for the application of the valuation rules of section 2031 than is usually presented by closely held corporations valued under section 20.2031-2(f), Estate Tax Regs. Both parties agree that the traditional methods of valuing these companies, such as industry price-earnings multiples, dividend yields or market value to book value ratios, are inapplicable to SMC and the shipping industry due to the fact that SMC did not experience earnings or have the capacity to pay out dividends in the years immediately prior to the valuation date and had a negative book value on the valuation date. In addition, companies comparable to SMC were very few in early 1972, and statistical extrapolation based on such a small sample is, thus, a hazardous exercise. For this last reason we are inclined to give substantial weight in these circumstances to SMC's particular predicament (as opposed to comparative valuation methods). In fact, there is a fair amount of agreement between the parties on *147 a number of relevant valuation criteria. SMC was in desperate straits, financially, on the valuation date. PGL had experienced multi-million dollar losses in 1970 and 1971. PSS was in default on its bank debt, unable even to meet interest payments let alone principal payments. As of the valuation date, the banks had virtually total control over whether to foreclose on the SMC stock and the stock of SMC's subsidiaries under the pledge agreement of 1969. Even if, as respondent argues, a prospective purchaser of SMC stock would not have been required to assume the decedent's guarantee of the PSS loans, a prospective knowledgeable purchaser would have been aware that 1) at any moment the banks could seize SMC's only assets (Admiralty and PSS stock) and 2) that the decedent and the decedent's son (the guarantors) did not even remotely possess the assets, in combination with the liquidation of the assets of SMC's companies, to make good the debt and avert such seizure. The consolidated net asset value (using market, as opposed to book, values) of Admiralty ranged from negative $14.5 million to negative $17.9 million as of December 31, 1971 (depending on whether respondent's or petitioner's *148 ship appraisal values are used). SMC had no stated book value. The outlook for the company in the future was at best highly speculative. The country was coming out of a recession in early 1972, but recovery for the shipping industry was far from certain. Future earnings and dividend paying capacity hinged largely on the success of LASH technology. Although in his statutory notice respondent determined the 37,500 shares of Class B SMC stock to be worth $5,883,518, he now asserts, based on the report of his expert, that such shares were worth "at least" $1,057,000 on the valuation date. Respondent's expert reached his conclusion essentially by the following multi-step process: First, he found two publicly traded stocks of ailing shipping companies, American Export Industries, Inc. ("American Export") (which owned a subsidiary in the shipping business) and Moore and McCormack Co., Inc. ("Moore-McCormack"). He then determined the ratios, as of February, 1972, for market capitalization to total book assets (not counting liabilities) and market capitalization to gross revenues for both these companies: Market Capitalization:
Market Capitalization: Total Assets
Total Revenues
American Export
9.3%
14.0%
Moore-McCormack
24.8%
52.3%
*149 Concluding that SMC was more analogous to American Export, the expert next constructed a market capitalization figure for SMC by multiplying American Export's percentages (reduced by 40 percent to reflect SMC's more precarious financial condition) by Admiralty's total assets [4] and total revenues and taking the average of the two resulting figures: $10,277,000. This last number was thus to reflect admiralty's market capitalization if it were a publicly traded company. The expert then multiplied the $10,277,000 figure by 69.8 percent to reflect SMC's equity interest in Admiralty.From the resulting figure he then *150 subtracted $7,520 (the value of SMC's Class A shares). Next, he multiplied the remaining figure by 49.5 percent (to reflect decedent's share of SMC's Class B stock) and discounted the last number by 70 percent to reflect SMC's shares' lack of marketability. The final number produced by all these adjustments was $1,057,000, representing the fair market value of the Class B SMC shares includible in decedent's estate. Petitioner's expert applied a different approach to valuing SMC. Rather than beginning with Admiralty's consolidated balance sheet, he chose to value each of the three operating subsidiaries, PGL, World Wide and Skouras Lines, separately and thereafter factor in the $40 million-plus debt of PSS. In valuing PGL, he used a method of comparing market values to book values of comparable companies as of the valuation date. He noted that one comparable publicly-traded company, American Export, had a 91.7 percent ratio of market to book value on the valuation date; Pacific Far East Line, Inc. and Moore-McCormack had market to book ratios of 46.5 percent and 39.5 percent, respectively. These numbers did not appear to correlate with the known profitability of those companies, *151 so no average of these ratios was then computed. However, the expert's sample was then widened to include a review of 11 sales of United States-flag shipping companies and the prices actually paid for the companies (which ranged from 37.8 percent to 110.2 percent of book value). These 11 purchases occurred over a period from 1952 to 1977. Petitioner's expert found a rough correlation between these price/book value ratios, and the health of each company (together with the health of the industry as a whole) at the time of each sale. He thus concluded that a price/book value ratio could be computed for PGL. The three sales occurring under circumstances most similar to PGL and the shipping industry's positions at the valuation date were: PSS's purchase of Grace Line, Inc. (i.e., PGL) in 1969 for $39.1 million [5] (57.8 percent of book value), Freighters, Inc.'s purchase of Pacific Far East Lines, Inc. in 1974 for $4.6 million (44.7 percent of book value) and Farrell Lines, Inc.'s purchase of American Export Lines, Inc. (American Export's shipping subsidiary) in 1977 for $33.7 million (39.3 percent of book value). In light of these last three sales and the particularly bleak financial *152 picture for PGL in 1972 (significantly worse than in 1969), the expert concluded PGL could be purchased as a going concern for 40 percent of its $59.6 million adjusted book value on the valuation date, or $23.8 million. Skouras Lines and World Wide, SMC's other operating companies, were each valued using a projected cash flow, income method combined with an appraisal of the fair market value of each company's single vessel. By this method Skouras Lines was valued at $1,089,747; World Wide at $193,534. The values of PGL, Skouras Lines and World Wide thus computed were then added together to reach an aggregate value for the operating companies of $25.1 million.It was then noted that PSS, the holding company parent of PGL, had outstanding debts, all in default, of over $44 million. No well informed investor, concluded petitioner's expert, would pay anything for a minority position in a closely-held, non-dividend-paying company whose assets *153 were worth little more than half of its bank debt and whose assets were subject to foreclosure at any moment by its creditors. In this case we are faced once again with evaluating the opinions of two knowledgeable experts who have reached vastly different conclusions. We reach our result both by an objective evaluation of the two expert's reports and our own considered perception of the likely future prospects of SMC as of February 16, 1972. Our primary problem is with the method of valuation chosen by respondent's expert. Both experts admit that the three most traditional methods of valuation -- price/earnings, dividend yield and market value/book value [6] -- cannot rationally be applied to SMC, at least at the parent level. Petitioner's expert attempted to get around this difficulty by still applying one of the traditional methods, market value (or purchase price)/book value to PGL, the main operating company in the chain of subsidiaries of SMC, which subsidiary did have a positive book value. Since the debt of PGL's immediate parent, PSS, far exceeded the value of PGL, World Wide and Skouras Lines combined, and since PGL would almost have had to double in value to equal *154 this PSS debt, the expert concluded that SMC stock would be of no interest to any knowledgeable and rational investor as of the valuation date. (SMC, Admiralty and PSS, of course, had no significant assets other than the stock in the operating companies.) Respondent's expert, confronted with the same valuation dilemma, employed ratios involving gross assets and gross revenues to value SMC. Neither respondent nor his expert has pointed us to any other instance where these particular reference ratios were employed. And, indeed, respondent's expert at trial admitted that he was unaware of the use of gross asset and gross revenue ratios by any valuation organization other than his own. There are problems in using the ratios of respondent's expert. Under his method, SMC would be valued twice as high if its gross assets doubled, even though at the same time its liabilities quadrupled. Similarly, *155 if the company's gross revenues doubled, but its expenses rose so high that sending out each ship brought in less revenue than needed merely to pay the crew (i.e., not counting fixed costs or other overhead), respondent's expert's value for the company would also double. This cannot be right. Use of the ratios chosen by respondent's expert does not produce rational results, even when limiting this method to companies with negative book values. The inability of this method to distinguish between merely sick companies and apparently dead companies compels us to reject its use. No amount of judgmental percentage reductions for actual company illness can really justify it. Accordingly, we accept the method used by petitioner's expert as the better one under the circumstances and conclude on a careful review of his analysis that he applied that method correctly. Respondent really only has three objections to petitioner's expert's report. First, respondent argues that the method does not value SMC as a going concern. We disagree. Each of petitioner's valuations of PGL, Skouras Lines and World Wide was based on an assumption of continued operation. PGL's valuation, the most *156 important valuation, was based on comparative ratios determined either from actual purchased shipping companies that were not thereafter liquidated or from market values of operating companies. Second, respondent argues that valuing each operating company separately and then adding in the debt of PSS does not reflect what a purchaser would really be buying if he bought SMC stock -- viz., a consolidated company. We disagree. SMC was only the sum of its parts. Certainly there was no added value to SMC because PSS, Skouras Lines and World Wide were all brother-sister subsidiaries. There is no evidence that there was any real operational integration of these companies. Considering that Admiralty had a negative book value when viewed as a consolidated entity, we do not think petitioner's expert acted arbitrarily in attempting a severable valuation of its parts. Respondent's third objection is that petitioner's expert's method assumes that once a company has negative book value, it has no fair market value. We think respondent oversimplifies petitioner's expert's conclusion. Petitioner's expert did not conclude merely on the basis of negative book value that SMC had no market *157 value.Rather, he noted that SMC, beside having no book value, was not paying dividends and would require tremendous appreciation in the value of its assets in the future to even approach the size of its bank debt (only then would foreclosure no longer be a real threat to an investor). Petitioner's expert concluded that the prospects for SMC to turn around and become profitable and eventually pay dividends were simply too remote as of February 16, 1972, to create investor interest. This last conclusion was perhaps more subjective than his other conclusions, it being a prediction of the future. SMC had staked its corporate life on LASH ships; all its other important prior activities (passenger carrying, the Peruvian and Chilean cargo trades) had become unprofitable. On the day before the valuation date, however, even the fate of LASH shipping appeared to be doomed. On that day a long-shoreman's contract was finally signed which saddled this new technology with many more times the number of workers (and concomitant wage expenses) than the ships were designed for. LASH ships were placed at a competitive disadvantage to container ships from which they were not likely to recover. *158 All of the above points inevitably to the conclusion that the SMC Class B stock had, at the very most, only such modest value as of the alternate valuation date as some prospective purchaser might have been willing to hazard on the pure speculation that a "deal" could be negotiated with the banks to keep the affiliated companies alive. SMC and its subsidiaries, although in default, were not formally bankrupt and until there was an adjudication which would have closed out the equity holders' interest, we think the stock had some speculative value, small though it might be. To determine value under such circumstances places the finder of facts in a substantial predicament, there being no real benchmark for making the determination. Nevertheless, for estate tax purposes the value of an asset must be determined in order to close the estate. Estate of Curry v. Commissioner,74 T.C. 540, 546-547 (1980). This is one of those innumerable situations when the finder of fact simply is obliged to do the best he can with the evidence available and arrive at a valuation as fair as possible. See Estate of Baldwin v. Commissioner,T.C. Memo. 1961-89. Having *159 weighed all the evidence in the case and using our best judgment under the circumstances, we conclude that the value of the decedent's Class B SMC stock on February 16, 1972, was $10,000. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect at the time of decedent's death.↩
2. By virtues of the terms of the first into which the decedent transferred his SMC share, the placing of the shares in the trust constituted a transfer with a retained life estate as provided in section 2036↩. The shares at whatever value herein determined are thus includable in decedent's gross estate. This result is not disputed by the parties.
3. Comprised of the $9.4 million and the $35 million PSS had borrowed from the banks to finance its purchase of PGL.↩
4. We note that even if we were to accept respondent's expert's method in this case as the more appropriate method, which we do not (see text infra↩), we believe that a downward adjustment to the book assets of Admiralty by $11.8 million (reflecting a contra account entitled "Excess of Equity Acquired Over Cost of PGL Stock" on Admiralty's balance sheet) would be called for. This adjustment, if carried through the remainder of respondent's expert's method, would reduce his final valuation figure for decedent's Class B SMC shares from $1,057,000 to $1,030,000.
5. This figure differs from the $44.5 million actual purchase price figure because part of PSS's purchase price for PGL was in effect paid by PGL through the latter's simultaneous inflated purchase of all remaining PSS operating assets.↩
6. See J. Bishop & A. Rosenbloom, Federal Tax Valuation Digest 3 (1981 cummulative ed.), a book summarizing and analyzing numerous prior valuation cases, and written under the sponsorship of Standard Research Consultants, the organization by which respondent's expert was employed.↩