**EDISON INTERNATIONAL, INC. (formerly Studebaker-Worthington, Inc.), Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 391–74.

United States Claims Court.

July 3, 1986.

J. Coleman Bean, Washington, D.C., for plaintiff. Richard G. Fehrenbacher and Robert C. Morgan, II, of counsel.

George L. Squires, Washington, D.C., with whom were Theordore D. Peyser and Acting Asst. Atty. Gen. Roger M. Olsen, for defendant.

OPINION

WILLI, Senior Judge.

The ultimate question in this suit is the entitlement, under section 165(a) of the Internal Revenue Code of 1954, as amend-

ed, of Studebaker-Worthington, Inc., plaintiff's immediate predecessor, to a deduction of $19,807,276.64 for its 1966 taxable year on account of the loss of goodwill said to have occurred in that year because it was then that Studebaker ceased manufacturing automobiles. Plaintiff contends that goodwill in that amount originated with Studebaker-Worthington's ancestor, Studebaker Corporation of New Jersey (hereinafter called Studebaker N.J.) upon the latter's formation in 1911 and remained unimpaired thereafter until 1966 when it was lost. Notably, throughout the extended trial plaintiff directed all of its proof to support of a goodwill figure in the full amount of the claimed deduction, thereby adducing no evidence that would substantiate any lesser goodwill value. In short, on the issue of goodwill valuation plaintiff has uniformly adhered to an "all or nothing" stance. Accordingly, the teaching of *Eli Lilly & Co. v. United States*, 178 Ct.Cl. 666, 372 F.2d. 990 (1967), becomes the relevant determinant of its litigating success or failure.

The government interposes a variety of defenses. First, it says that Studebaker N.J. acquired no goodwill whatever at its inception because the transaction that created it involved no purchase of assets of any kind, goodwill included. Next the government asserts that should it be found, despite the absence of a purchase, that Studebaker N.J. did indeed acquire some goodwill as a result of the formative transaction it was in no event on an order of magnitude even remotely approaching the 19 million-plus figure. Finally, the government contends that any goodwill that Studebaker N.J. may be deemed to have acquired was variously and necessarily either reduced or extinguished by virtue of certain events that occurred after 1911 and before 1966, the year for which the loss is claimed.

All facts emergent from this voluminous record necessary to the conclusions reached and to an understanding of the basis of these conclusions are set forth in this opinion.

For the reasons that follow it is concluded that plaintiff may not recover. This action must therefore be dismissed.

## PRINCIPLES GOVERNING LOSS DEDUCTIBILITY OF GOODWILL

Before proceeding further it is helpful to briefly recapitulate the ground rules for ascertaining the deductibility of an asserted loss of goodwill.

Code section 165(a) authorizes a current deduction for the amount of "any loss sustained during the taxable year and not compensated by insurance or otherwise." Such a deduction is available for the loss of nondepreciable as well as depreciable property, goodwill being nondepreciable primarily because of its indeterminate useful life.

Subsection (b) of section 165 limits the amount of the deduction to the adjusted basis of the property in question, such being that prescribed by section 1011. For the meaning of basis we are remanded to section 1012 which defines that quantity as cost. Complementary section 1.1012–1(a) of the Treasury Regulations defines cost as "the amount paid for such property in cash or other property." Finally, section 1.1053–1(b) of the Treasury Regulations directs that as to property acquired before March 1, 1913 (as is the case here), basis shall be cost unaffected by its fair market value on that date.

## BACKGROUND AND CONSUMMATION OF THE 1911 TRANSACTION

In February, 1852, Henry and his brother Clem Studebaker formed a partnership styled H & C Studebaker to operate a blacksmith shop and wagon-building business. In 1858, Henry and Clem were joined by a third brother, John. The firm soon gained a reputation for building wagons of quality and it profitted handsomely from the demand for wagons caused by the Civil War.

In 1868, the partnership business was incorporated as Studebaker Brothers Manufacturing Company. The corporation's

stock was owned by three brothers *viz* Clem, John, who had acquired Henry's interest, and Peter who had joined the business shortly after John and who served as the firm's principal salesman. The business continued to grow and prosper. In 1871, the corporation declared its first dividend. Annual sales reached $1,000,000 in 1875 and $2,000,000 by 1887.

So far as the record discloses the Studebaker brothers had their first encounter with J.P. Morgan in 1896. In that year Morgan arranged a $2,000,000 loan for the corporation, taking approximately 11 percent of its outstanding stock for his services.

In 1897 Peter Studebaker died as did his brother, Clem, in 1901. After Peter's death, Frederick S. Fish, John's son-in-law, became the corporation's financial manager while John oversaw its manufacturing operations.

By the turn of the century interest was building in this country for the development of self-propelled vehicles as the successor to horse-drawn conveyances. In 1893, Henry Ford and Ransom Olds built their first automobiles. The Studebakers were interested in positioning their firm to participate in the potential self-propelled vehicle market. Their engineers worked toward that end and the result of their effort was an electrically powered car. Production was begun and 20 such cars were sold in 1902. Although the Studebaker firm continued to manufacture electrically powered cars in modest volume until 1912, the speed and range limitations of electricity as a power source made it apparent almost from the outset that gasoline would be the energy source of choice. Recognizing that reality and lacking the capability to produce power plants of that type in-house, the Studebakers entered into a joint venture with the Garford Auto Company of Elyria, Ohio under which the latter was to supply chassis and engines with Studebaker providing the bodies and handling the marketing of the finished product. The first cars produced by the venture were sold in 1904. While the product

received satisfactory acceptance in the market, productive capacity was modest relative to that emerging in the Detroit area-firms such as Ford, Buick, Cadillac and Olds. Thus, in the 1905–1907 era the Studebaker interests found themselves as (1) the world's largest producer of horse-drawn vehicles, a transportation mode rapidly being eclipsed by motor power (2) producing a limited quantity of electrically powered cars for which demand was limited by the performance constraints inherent in the power source and (3) having an interest in the production and sale of gasoline powered cars in a volume so small relative to the competition that the undertaking did not represent a significant factor in the market that the Studebakers felt represented their business future. Given these circumstances and their long-range objective, the Studebakers were attracted to the personnel of the Everett-Metzger-Flanders Company (hereinafter called EMF), even before EMF was organized in August, 1908, to acquire the business of the Wayne Automobile Company of Detroit. Shortly thereafter EMF also acquired the Northern Motor Car Company of Detroit. These two acquisitions provided EMF with substantial production facilities that were operated very successfully under the direction of Walter E. Flanders, one of the premier production men of his time. EMF began operations under an agreement concluded with the Studebaker interests under which the latter supplied the bodies and marketed the finished product. The combination was successful from the outset. In the remaining months of 1908 EMF produced 8,132 cars on which it realized a profit of $1,625,-899. Cognizant of this success and anxious to maintain an adequate supply of cars for Studebaker's dealer network, that company's officers purchased approximately one-third of EMF's capital stock in April, 1909. Despite that substantial equity position, friction soon developed between EMF management and the Studebaker interests, the principal cause apparently being EMF's dissatisfaction with Studebaker's role as sole marketer of the product. Nonetheless, EMF's production increased until,

in 1910, it produced 15,300 cars—a substantial achievement in a market environment that found many entrants desirous of capturing a portion of the burgeoning demand for gasoline powered automobiles but very few survivors, the near-term mortality rate being approximately 90 percent.

Early in 1909, the Studebaker interests began an effort to acquire the two-thirds of EMF stock that remained following their purchase in the preceding year. The Studebakers found that J.P. Morgan held an option on all of those remaining shares. Negotiations followed, including, at Morgan's insistence, a detailed appraisal (made by the American Appraisal Company) of all tangible assets owned by Studebaker Brothers Manufacturing Company and EMF. The negotiations culminated in early 1910 with an agreement under which the Studebakers purchased the remainder of EMF's 100,000 shares for $3,795,605 payable to Morgan of $1,000,000 on April 1, 1911, $1,000,000 on October 1, 1911 and $1,795,605 on April 1, 1912. The deferred payments were secured by a pledge of all 100,000 shares of EMF stock and all of the first preferred of Studebaker Vehicle, a New York corporation formed to serve as parent of two wholly-owned subsidiaries, Studebaker Brothers Manufacturing and EMF. In addition, Morgan received an option to handle any refinancing of Studebaker Vehicle that occurred at any time before January 1, 1911. Late in 1910, however, Morgan informed the Studebakers that he would not exercise that option. This development left the Studebakers in a difficult position, given the tight repayment schedule on their purchase obligation with Morgan (a $1,000,000 payment due in approximately six months) and the fact that at the time Studebaker Brothers Manufacturing had short-term borrowings of more than $8,000,000 (personally guaranteed by John Studebaker) and a bonded debt of $2,795,-000. Moreover, the evidence shows that Morgan, who had representation on the Studebaker Vehicle board, actively discouraged the banking community from extending further credit to the Studebaker interests.

In the above circumstances, Studebaker Management initiated a search for an investment banker to handle a refinancing. Goldman, Sachs & Co. was not unfamiliar to the Studebakers, having periodically marketed commercial paper for them in the past. Goldman was selected and for the undertaking it formed an investment banking group consisting of itself, Lehman Brothers and the London firm of Kleinwort Sons & Co.

On January 27, 1911, the Studebaker interests and J.P. Morgan (who, it will be recalled, exacted 11 percent of Studebaker Vehicle as the price of arranging a $2,000,-000 loan for that company in 1896) entered into an underwriting agreement with the investment banking group. The agreement called for the formation of Studebaker Corporation, to be incorporated in New Jersey with a capital structure of 150,000 shares of $100 par value 7 percent cumulative preferred stock and 300,000 shares of $100 par value common. All of the common and 135,000 shares of the preferred were to be issued and outstanding. The new company, hereinafter called Studebaker N.J., was to issue 135,000 shares of its preferred and 208,000 common shares to Studebaker Vehicle in return for $8,447,253.55 in cash and all of the assets of EMF and Studebaker Brothers Manufacturing except for approximately five million dollars worth of real estate owned by the latter but functionally unrelated to the manufacture of automobiles. The agreement permitted that real estate to be distributed to the Studebaker interests and retained by them. The agreement further provided that the underwriting group would pay Studebaker Vehicle $13,500,000 for the 135,000 Studebaker N.J. preferred shares. As compensation for underwriting the par value of the preferred the group was to receive 92,000 shares of common, the remaining 208,000 shares of common to be distributed pro rata to the shareholders of Studebaker Vehicle. Those shares, unlike the commission shares received by the underwriting group, were subject to a letter restriction prohibiting their resale before April 1, 1912.

The underwriting agreement contained a number of stipulations concerning the preferred shares that enhanced their marketability beyond that stemming from the fact that they were backed, in the first instance, by net tangible assets of over $23,000,000, as will be shown. Callable at $125 per share, an attractive premium, the preferred was subject to a stringent sinking fund requirement that prohibited dividend payment on common until the fund reached $1,000,000 and thereafter limited common dividends to 6 percent until the fund reached $2,500,000. The fund could be tapped to pay preferred dividends but no common dividends could be paid, even though the sinking fund balance remained over $2,500,000, until the monies withdrawn for that purpose had been replaced. No additional preferred could be issued except with approval of three-quarters of the preferred shares outstanding.

The most onerous of the stipulations attaching to the preferred shares was that attaching to dividend default. The 7 percent preferred dividend was payable quarterly. The underwriting agreement provided that in the event of default on two consecutive preferred dividends the voting power of the common shares would vest in the preferred and remain there until the entire amount of the default was restored. This meant that only a six month lapse in preferred dividends would vest control of the company in the preferred shareholders.

An opening balance sheet for the proposed Studebaker N.J. was prepared for underwriting and prospectus purposes. It reflected capitalization of $43,500,000, as contemplated by the underwriting agreement, total tangible assets of $37,259,879.18 and total liabilities of $13,567,155.82, resulting in a net asset balance of $23,692,723.36. The $19,807,276.64 gap between that figure and the stated capitalization of $43,500,000 was filled by the appearance among assets of a goodwill item in that amount.

Goldman commissioned its auditor, Touche Niven, to verify the balance sheet described above. It also retained American Appraisal, which had recently valued the tangible assets of Studebaker Manufacturing and EMF at J.P. Morgan's behest, to make a valuation of the proposed Studebaker N.J.

While the parties disagree as to the basis for and consequently the significance of the two firms' announced conclusions in response to their retainers, the fact is that both accepted the capitalization figure of $43,500,000 and the dependent 19 million-plus figure shown for goodwill on the Studebaker N.J. balance sheet. Suffice it to say, all contemporaneous documentation of the transaction adopted a total concern value of $43,500,000 for Studebaker N.J. That corporation was organized on February 14, 1911 and the underwriting agreement implemented promptly thereafter. Studebaker N.J. common shares (those received by the underwriting group) traded initially on the Cart Exchange, now known as the Over-the-Counter Market. In the three months following February, 1911, 59,219 of those 92,000 shares were sold at prices ranging from $49 to $50 per share. Studebaker N.J. common gained listing and began trading on the New York Stock Exchange on June 27, 1912.

## PLAINTIFF'S EVIDENCE OF STUDEBAKER N.J. GOODWILL VALUE

At the outset it is important to bear in mind that $19,807,276.64 is the only goodwill value for which plaintiff has contended throughout this proceeding. Consequently, all of its evidence was directed to that single end. Since, in keeping with the evidence, the parties agree that the balance sheet figures for total tangible assets and total liabilities ($37,259,879.18 and $13,567,155.82, respectively) are correct, there is an interdependent relationship between the value assigned goodwill and that assigned the business as a whole. In order for the whole to be worth $43,500,000, the amount for which it was capitalized ($13,500,000 preferred and $30,000,000 common), goodwill must be valued at no less than $19,807,276.64.

Plaintiff relies, in the first instance, on the fact that all documents appurtenant to the formation of Studebaker N.J. stated the total value of the concern to be $43,500,000. In no instance, however, has plaintiff shown that any of the authors of those documents had an economic self-interest in ascribing a lesser value to the business. The value representation appearing in those documents must be evaluated in that light.

Plaintiff's principal witness, Mr. Milo Snyder, was an experienced investment banker.

After explaining that the fixing of a total enterprise value was the function for which the investment banker was uniquely qualified, Mr. Snyder testified that such determinations were inappropriate to the skills of accountants and appraisers who are typically called upon by underwriters to render subordinate advisory services within the more limited areas of their special competence. According to Mr. Snyder, it is the function of the investment banker, whose reputation is on the line in each underwriting, to project the likelihood and extent of the subject enterprise's future profitability in the market place and to then assign a present value to such perceived future profits. That present value Mr. Snyder describes as the intrinsic value of the business. Thus, in this case he hypothesized that the author of the $43,500,000 capitalization figure representing total concern value was Goldman Sachs.

Finally, Mr. Snyder expressed his own view that, considering the value of Studebaker's name recognition and reputation for quality in the wagon and carriage business coupled with the near-term success of the EMF venture reinforced by the large and growing appetite of the American consumer for automobiles, the intrinsic value of Studebaker N.J. in 1911 was $43,500,000. He discounted the significance of the fact that in 1911 Studebaker N.J. common was trading publicly in the $49–$50 range, that as contrasted with its $100 par value. He did so on the premise that it was not until 1915 that sufficient trading volume occurred to make stock price a relevant measure of total concern value.

Next plaintiff called two expert appraisers, Mr. Gates of Marshall and Stevens, Inc. and Mr. Gross of the American Appraisal Company, to express their respective opinions of the total value of Studebaker N.J. in 1911.

Eschewing resort to comparables or any other method of interpolating value from observation of an unrelated party's conduct or operating experience, both men devised present value by a process of discounting hypothesized future profits resulting from projected future sales and assumed profit margins thereon.

The gentlemen's sales assumptions differed materially. Mr. Gross assumed that sales of wagons and carriages would increase 5 percent annually through 1920—a highly questionable thesis in view of the sustained displacement of carriages and wagons by motor vehicles that began soon after the turn of the century. As to cars, Gross assumed a 1911 volume of 22,000 vehicles followed by annual increases of 25 percent through 1915 and 15 percent from 1916 through 1920. Mr. Gates, conversely, assumed actual sales for 1911 (22,555 units) and, without distinction between horse-drawn and motor-powered vehicles, assumed an annual volume increase of 15 percent from 1912 through 1920. The difference in the gentlemen's assumptions as to sales volume resulted in American Appraisal's hypothesizing 1920 sales of $158,000,000 whereas Marshall and Stevens posited sales of $100,000,000 for the same year.

As to profitability, Mr. Gross assumed a 10.4 percent profit margin on sales while Mr. Gates assumed a 12.5 percent margin.

The differences in assumptions as to sales volume can impact radically on the conclusion as to total concern value. For example, whereas Mr. Gross concluded from his exercise that Studebaker N.J. had a total value of $43,700,000 in 1911, if one were to accept his entire computational approach except for substituting the Marshall and Stevens sales projections, the indicated

total value of the enterprise would be $29,854,000—a difference of almost $14,000,000 and a result that would produce a goodwill value of $7,126,000—that in contrast with a goodwill figure of $20,972,000 derived from American Appraisal's total exercise, including its assumptions of sales volume—an assumption, it will be recalled, that postulated a 5 percent annual increase in sales volume of carriages and wagons after 1911.

While the American Appraisal calculation made provision, in its discounted value of future profits, plus depreciation, for the additional plant required to support the increased production necessary to achieve the increased sales that were projected, it made no provision for the expanded working capital that would be equally requisite. On the other hand, Marshall and Stevens made no provision whatever for the additional capital necessary to support the additional sales that it projected for the future. On the other hand, if one were to accept Marshall and Stevens computational approach in the entirety, except for substituting American Appraisal's hypothesis as to future sales, an indicated value of goodwill in the approximate amount of 33 million dollars would result.

Finally, the two experts discounted to present (1911) value the cash flow (net profits plus depreciation) that they projected for future years. American Appraisal used a 15 percent rate and Marshall and Stevens a rate of 12.5 percent. Mr. Snyder testified that the investing public's 1911 perception of the risk of failure in the automobile industry was such that a 15 percent return would have been insufficient to induce investment.

In sum, the experts' value conclusions are premised so much on subjective assumptions lacking underlying support in the record as to render those conclusions essentially meaningless in the context of this litigation.

Plaintiff's final significant witness, Mr. Borruso, a CPA employed by the public accounting firm of Coopers & Lybrand, addressed the question of whether Studebaker N.J. could be deemed to have acquired a tax basis in goodwill, given the accounting practices prevailing in 1911. While he was an obviously intelligent and well prepared witness, the thrust of his testimony only becomes important if it be assumed that Studebaker N.J. had goodwill of a value exceeding 19 million dollars, however acquired. Since evidence fails to support a goodwill value of that magnitude his testimony becomes beside the point. The same is true as to defendant's opposing witness, Professor Martin.

## DEFENDANT'S EVIDENCE OF STUDEBAKER N.J. GOODWILL VALUE

Given the plaintiff's all-or-nothing litigating stance respecting a goodwill value of $19,807,276.64 for Studebaker N.J. in 1911, the evidentiary burden for defendant is not to prove any particular goodwill value for the company at that time—only to show that such goodwill as it may have had did not approach that order of magnitude, defendant presented its case accordingly.

As its first witness defendant call Dr. Irving L. Plotkin and fully qualified him as an expert in economics. His testimony was pertinent and penetrating.

First, he established that the prevailing climate in the unregulated investment banking community of the early 1900s, when par value of securities then typically $100 had, according to Mr. Snyder, much greater market significance than it has today, condoned the practice of capitalizing a business for a value greater than that represented by its tangible assets. The practice was colloquially known as stock watering. Typically the gap between capitalization and net value of physically discernable assets was bridged by assigning the appropriate number (i.e., that necessary to achieve balance between net assets and capitalization), to the untangible quantity known as goodwill. Henry Goldman pioneered the technique of factoring projected future profitability into a current balance sheet, calling the result of the projection goodwill. Although such practice is not countenanced today, resort to it in earlier

times should not necessarily be deemed as animated by bad faith or fraudulent intent. The presumption of such motivation would logically increase in direct proportion to the size of the goodwill figure relative to the balance of net tangible assets.

Addressing the immediate question of goodwill value in this case, Dr. Plotkin defined his position as not contending for any specific quantification as the "right" answer. Rather, he explained, his thesis was simply that whatever goodwill Studebaker N.J. may have had in 1911 did not approach 19 million-plus in value.

Again it should be noted, and no party contends otherwise, that a 1911 goodwill value of $19,807,276.64 for Studebaker N.J. is supportable only if it is found that its common stock was worth $100 per share at that time.

Dr. Plotkin relied primarily on two considerations to demonstrate that Studebaker N.J.'s common stock did not have a worth approaching $100 per share in 1911. Most telling to him was the fact that if one were to credit $100 as the value of a share of Studebaker N.J. common, one would have to believe that the Studebaker interests were will to pay Goldman $9,200,000 for raising $13,500,000 for them—a commission of roughly 70 percent. Such a rate of commission, Dr. Plotkin explained, is wholly unprecedented in the recorded history of investment banking. That history reflects commissions ranging mainly from 2 to 10 percent, with 15 percent received in some underwritings that were particularly fraught with risk. This underwriting of preferred dealt with a particularly sound investment. The $13,500,000 preferred issue was backed by net tangible assets is excess of $23,000,000, reinforced by the many stipulations that Mr. Snyder regarded as particularly tough on the issuer. Consistent with that degree of soundness, the evidence shows that the underwriters had little difficulty in selling out the preferred in a short period of time. Finally, as to the incredibility of the underwriters receiving a 70 percent commission for buying the preferred at par, Dr. Plotkin reviewed

the terms of the underwriting option that J.P. Morgan obtained in conjunction with his arrangement of financing for Studebaker's purchase of the remaining two-thirds of EMF stock in 1910. That option, which Morgan, for undisclosed reasons, elected not to exercise, would have yielded him a commission of approximately 20 percent. Given his well known taste for money, it is difficult to believe that Morgan would have eschewed the underwriting performed by Goldman had he thought that it would have provided him a 70 percent commission.

The second major consideration that persuaded Dr. Plotkin that no one, including Henry Goldman, thought that Studebaker common was worth $100 per share was a highly confidential letter antedating the underwriting agreement, from Goldman to Kleinwort. The obvious purport of the letter was an attempt by Goldman to induce Kleinwort to join the underwriting group. In that letter, which was labelled "Private and Absolutely Confidential," Goldman advised Kleinwort that it can anticipate receiving $50 a share for the Studebaker common that it would receive as compensation for underwriting the preferred. Notably, if the common is deemed worth $50 a share rather than its $100 par value then more than 75 percent of the value assigned goodwill in the Studebaker balances sheet necessarily disappears.

Finally, Dr. Plotkin added perspective to evaluation of the significance to be accorded the ostensible ratification by Touche, Niven and American Appraisal of the Studebaker N.J. balance sheet showing a capitalization of $43,500,000 as well as the constituent goodwill element of $19,807,-276.64. Plotkin pointed out that in 1922 Studebaker asked Touche, Niven to prepare an analysis of the 1911 transfer of property from Studebaker Brothers Manufacturing and EMF to Studebaker N.J. To facilitate the task, Studebaker authorized Touche, Niven to obtain data from American Appraisal concerning its appraisal of February 3, 1911. In a written communication to American Appraisal a Touche, Niven partner asked the firm to explain the basis of

its conclusion that goodwill supporting the $43,500,000 capitalization represented a value of between 19 and 20 million dollars. American Appraisal responded by advising that the goodwill figure was determined at a New York conference and that it had no records reflecting the basis of the determination (for which it billed a modest fee of $1,000 at the time).

In sum, Dr. Plotkin concluded that while he would not assign a specific value to Studebaker N.J. goodwill, such value could in no event exceed $4,800,000 and was more likely in the area of $1,800,000, those figures being implicit in a common stock value of $50 and $40 per share, respectively.

Defendant's final witness, Marshall Noecker, was qualified as an expert in financial analysis. His testimony complemented that of Dr. Plotkin. It was therefore, like Dr. Plotkin's, directed to showing what Studebaker goodwill value was not rather than what it was.

He first addressed the valuation exercises of the Marshall and Stevens and American Appraisal expert witnesses in detail, and the illumination furnished by Mr. Noecker forms the basis for the observations concerning the infirmaties of those exercises previously set forth herein.

He then described two contemporary transactions, one an acquisition and one an option to acquire, that he felt were reasonably comparable in size and nature to the formation of Studebaker N.J. in 1911. The first was the acquisition of Cadillac by General Motors in 1909. For that acquisition General Motors paid 2.37 times Cadillac's current earnings. The option to acquire involved Ford. In 1909, William Durant, the architect of General Motors, obtained an option to buy the Ford Motor Company for $8,000,000 cash, payable partly on a deferred basis. Mr. Durant had to let the option lapse because he was unable to secure the necessary financing. In 1909, Ford, then the preeminence of success in the industry, earned $3,125,876. The optional purchase price therefore represented 2.56 times earnings. By analogy, for the period 1906 through 1910 Studebaker earned an average of $702,937. From its inception until year-end 1909 EMF had operated for 29 months. Over that period it made a profit of $1,147,694. It reported a profit of $1,606,306 for 1910. The confirmed earnings of Studebaker Brothers and EMF averaged $1,842,523. Applying a 2.5 multiple to that figure yields a total concern value, including goodwill, of $5,000,000. Given that total concern value, if one were to take account of actual net tangible assets of some 20 million, a substantial negative value for goodwill would result.

Finally, Mr. Noecker approached the valuation of the Studebaker total concern from the standpoint of the price at which its common stock was publicly traded.

As previously noted, in the 90 days following February, 1911 some 59,000 shares traded at $49–$50 per share. Expanding that period to June 26, 1912, the date on which the issue began trading on the New York Stock Exchange, we find that the stock traded in a range of $34 to $69.78, averaging $52 per share. From then until December 31, 1912, the stock traded between a low of $30 and a high of $49.50, averaging $39.75 per share. Given this trading record and noting that, as Goldman stated in its letter to Kleinwort, it was necessary for the underwriters to purchase the stock in order to maintain a $50 price. Mr. Noecker concluded that $40 per share would be a fairly representative price for Studebaker common. Should those shares be so valued on the Studebaker N.J. balance sheet, the company's goodwill would be necessarily valued at $1,800,000.

## CONCLUSION

For the reasons previously set forth, it must be concluded that plaintiff has failed to demonstrate by a fair preponderence of the evidence that the 1911 goodwill value of Studebaker N.J. was $19,807,276.64 or indeed any amount even remotely approaching that figure. Accordingly, it is unnecessary to pass on defendant's several alternative contentions, of without preju-

dice to its right to rely on them should they become viable at a later date. It suffices to say that none of those contentions appears to be without merit.

In view of the foregoing, the Clerk will dismiss the petition (now complaint), each party to bear its own costs.