Frederick G. KRAPF, Jr., and June B. Krapf, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 187–85T.

United States Claims Court.

July 20, 1989.

Robert E. Schlusser, Wilmington, Del., for plaintiffs.

Kenneth C. Gobetz, with whom were Mildred L. Seidman, George L. Hastings, Jr., Washington, D.C., and William S. Rose, Jr., Asst. Atty. Gen., for defendant.

## OPINION

SMITH, Chief Judge.

This case concerns a tax refund claim of $211,646.81 in tax and assessed interest for the taxable years beginning 1976 through 1979. The dispute arises over the fair market value of 26,000 shares of common stock in Mechtron Industries, Inc. (Mechtron), claimed as charitable deductions of $260,-000.00 by plaintiffs under I.R.C. § 170(a) (1954). It is the opinion of this court, based upon evidence heard at trial and argument in post-trials briefs, that plaintiffs are not entitled to the full amount of the claimed refund. However, for the reasons set forth below, the court finds plaintiffs are entitled to a deduction in the amount of $112,840.

## Facts

### Financial History of Mechtron

The company was organized in March of 1971 as a "S" Corporation. Mechtron's place of business was known as the Bancroft property located in Wilmington, Delaware. Mechtron utilized accounts receivable financing where Mechtron borrowed a percentage of the capital necessary for each invoiced job from the Delaware Trust Company.

When Mechtron was first organized in March of 1971, it was solely in the business of constructing scientific instrument chassis which involved sheet metal work. Some months later, Mechtron submitted a bid to the Pennsylvania Central Railroad to supply sheet metal parts for railroad cars. This bid was accepted, beginning a turbulent career for the company in the rail car business.

In 1972, Mechtron's expansion into the railroad business continued on a larger scale. Mechtron began work with Amtrak for the repair and refurbishment of Amtrak's dining cars. Under the terms of their agreement, Mechtron's contract with Amtrak had to be renewed yearly. The labor rate, which included labor as well as overhead, was also negotiated yearly. The price for the refurbishment was determined after a "receiving inspection" by employees of Mechtron and Amtrak. Mechtron's contract with Amtrak provided Mechtron with 90 percent of its business by 1976.

Mechtron's good fortune in obtaining the Amtrak contract did not attach to the Bancroft work site. There was only one railroad spur on the property, and that spur had to be rebuilt in order to bring railroad cars into the Mechtron shop. Yet, this was only a temporary site since a newly-constructed residential development cut off rail access to the plant. In 1974, although Mechtron continued to use the Bancroft site for instrument chassis construction, the Mechtron rail division was forced to relocate to the B.F. Shaw plant, also in Wilmington.

The new plant, however, like the old, also became the source of problems for Mechtron. The Shaw plant was ill-suited to the rail car refurbishment business and substantially limited Mechtron's profit potential. Mechtron was faced with installing tracks at the Shaw plant and hiring employees from an unqualified and untrained work force. In addition, Mechtron was forced to share the building with a pipe rolling business for approximately six months. All the while, Mechtron was under severe pressure by Amtrak to increase its output from four to ten refurbished dining cars per month.

These problems at the work site created a need for increased capital. In order to meet this need, and in an anticipation of its move to the Shaw plant, Mechtron purchased the Chesapeake Steel Company (Chesapeake) from Krapf Metal Sales. Chesapeake was an unrelated company engaged in the engineering and fabrication of heavy metal structural steel for the construction of buildings.

Chesapeake was expected to provide Mechtron with increased capital because of its assets. These additional assets were to make Mechtron a safe risk for obtaining bank loans. However, within two years after the purchase, the profitability of Chesapeake went into decline. As a result, when Mechtron requested an increase in the amount of its existing loan, secured by Chesapeake's assets, the Delaware Trust

Company denied the application. Thereafter, Mechtron turned to the Farmer's Bank of Delaware and was given a line of credit.

Beginning in 1976, Mechtron faced increasing financial difficulty. In May of 1976, the Farmer's Bank of Delaware disallowed any further borrowing on the corporation's receivables. Organizational problems throughout the year also exacerbated Mechtron's cash flow problems.

Mechtron's inability to generate cash flow had a cumulative effect. It prevented the company from stocking a proper inventory. Ideally, the parts necessary to refurbish a dining car would be in inventory and work could begin once a "receiving inspection" was completed. However, since Mechtron could not stock an adequate parts inventory, work on refurbishing the dining cars was delayed until the parts were received from the manufacturers. Consequently, this delay prevented a rapid turn around of completed railroad cars that decreased Mechtron's cash flow still further.

In 1976, Mechtron also began experiencing labor problems. Early in the year, a wildcat strike resulted in a production slowdown. Numerous labor unions attempted to organize Mechtron's employees. Unionization was a fear for Mechtron's management since the union's labor rates were nearly double the rates Mechtron was paying.

The most devastating blow to Mechtron's business, however, came in December of 1976. At that time, Mechtron received official notice from Amtrak that no further dining cars would be sent for refurbishment. Amtrak apparently terminated its business with Mechtron because of pressure by labor unions and because of Mechtron's ongoing production problems.

After Mechtron lost the Amtrak business, it attempted to compete for contracts with various transit authorities. However, transit authorities in many states required those submitting bids to qualify for performance bonding. These performance bonds were granted upon a showing by the bidding company that its financial structure was sound. Because of Mechtron's poor financial condition, it was not able to qualify for the mandatory performance bonding. Thus, Mechtron was unable to obtain these contracts even when it was the low bidder.

In 1978, Mechtron hired a consulting firm, Ford, Bacon & Davis (FBD) to advise Mechtron on how to increase its car output. The FBD report identified numerous problems created primarily by the layout of the Shaw plant. The report also proposed several recommendations for improving the production capabilities of Mechtron. However, most of the proposed solutions were not initiated because of the company's inability to generate the necessary capital and because of the physical limitations of the plant.

During May of the following year, Mechtron was still at the Shaw location constructing instrument chassis and refurbishing railroad cars and rapid transit cars. At that time, Mechtron entered into a contract with North American Car Corporation to assemble hopper (coal) cars in lots of 300 from kits manufactured by a Rumanian company. Mechtron initially agreed to a contract price of $4,500 per assembled car.

Mechtron hired Nisson Finklestein as a consultant and as corporate chief financial officer that same year. Finklestein's analysis of the North American Car contract revealed that Mechtron's costs were actually in excess of $10,000 per assembled car. Further, Mechtron stood to lose $5,500 per car which potentially could have terminated the company since Mechtron had 300 cars to produce. Finklestein, however, renegotiated the contract price to $9,000 per car, and lowered Mechtron's costs in order to break even.

In early 1981, Mechtron entered Chapter 11 bankruptcy. Thus ended the company's ten-year existence.

*Mechtron Stock Transactions*

1. *Buy–Sell Agreements Between the Principal Stockholders*

When Mechtron was formed in March of 1971, the principal stockholders of the corporation were Frederick Krapf, Jr., Clifford Winton, and Edwin Pierce. Each of these

principal stockholders was issued 26,000 shares of common stock, at a price of $15,000 per shareholder.

At this time, Messrs. Krapf, Winton and Pierce entered into the first of two buy-sell agreements which restricted transfers of the Mechtron stock. In the event a shareholder desired to transfer his shares of Mechtron stock, this executed agreement provided Mechtron with the right of first refusal. However, this agreement did not designate a fixed price for these shares.

In 1975, Mechtron's Board of Directors met to discuss revising the original buy-sell agreement. The proposed revision, drafted on October 17, 1975, included a price per share of ten dollars and was approved by the Board of Directors. Although the revised agreement was signed by Messrs. Krapf and Pierce, the parties dispute whether or not the document was signed by Mr. Winton before his death in 1975. The parties do agree, however, that sometime in the fall of 1975, the agreement was disregarded by the directors in order to allow for the free transfer of common stock, held by the deceased Mr. Winton, to decedent's son.

### 2. *Employee Sales*

At the time of Mechtron's incorporation, two of Mechtron's employees, Robert F. Engler, Jr., and James Olivere, Jr., were each given 1,000 shares of common stock. Mr. Engler was employed as secretary-treasurer of Mechtron; Mr. Olivere managed the instrument chassis division. In the fall of 1974, Mr. Engler was relieved of his duties at Mechtron and was assigned to manage the Chesapeake Steel Corporation, a subsidiary of Mechtron.

When Mr. Engler was relieved of his duties, Mechtron's Board of Directors adopted a resolution to repurchase all of Mr. Engler's 1,000 shares and all of Olivere's 1,000 shares at ten dollars per share. The record reflects three reasons for this repurchase. First, Mechtron wanted to financially compensate Mr. Engler for three years of loyal service to the corporation. Second, the directors were concerned with Mechtron's financial problems. Finally, the principal stockholders wanted to ensure that they retained full control over the corporation. Although, Mr. Engler accepted Mechtron's repurchase offer at ten dollars per share, Olivere refused.

While Mechtron attempted to redeem Messrs. Engler's and Olivere's stock, Mechtron's directors approved a motion to issue 1,000 shares of common stock to Mr. Engler's replacement, Roderick E. Bowden. It is unclear from the record, however, whether the stock was issued to Mr. Bowden as an incentive to join the company or in lieu of cash compensation for services rendered.

### 3. *Krapf's Stock Transactions Until September 2, 1976*

In 1973, Mr. Krapf increased his original one-third ownership in Mechtron. The corporation purchased Chesapeake from Krapf Metal Sales which was owned by Mr. Krapf and his sons. Mechtron issued 2,171 shares of a new class of stock, i.e. preferred stock, to plaintiffs.[1] The corporation also obligated itself to redeem all such shares of preferred stock by July 1, 1982, at a redemption price of $100 per share.

The holders of this preferred stock were entitled to cumulative dividends at the rate of five percent per annum on its par value. The dividends were payable on June 30 of each year, beginning in 1973. The parties dispute whether the annual dividends on this preferred stock were paid from June 1973 until the company's demise in 1981.[2]

---

1. The preferred stock was entitled to certain voting rights if consecutive annual dividends payable on the preferred shares were in default. First, the preferred stock was entitled to one vote per share. Second, as a voting class, the preferred stock would obtain the right to elect a majority of the Board of Directors of the corporation. Upon full payment of the dividends, the voting power was again vested in the common shares.

2. However, Mr. Ohanian, government's expert witness, testified that Mechtron paid a cash dividend of $15,000 on the preferred stock in 1975. Tr. 345. Therefore, the court determines that Mechtron was not in default on dividends at the time of the gift. Moreover, even if the company defaulted on the dividends, no evidence was

Mr. Krapf maintained full control of this preferred stock until Mechtron's bankruptcy in 1981.

On August 9, 1976, Mr. Krapf resigned as a director of Mechtron. One month later, Mr. Krapf donated all of his 26,000 shares of common stock to the University of Delaware. Plaintiffs' gift was conditioned with the following language:

> I am giving this with the stipulation that the University must hold this stock for at least five years for I believe it will not be before then that it reaches its true value. Should the University want to sell this stock before five years, I would like it to be my prerogative to release it before that time. Should this in any way cause a problem with you, please let me know.[3]

Pursuant to this donation, Mr. Krapf claimed charitable deductions on his federal income tax. These amounts totaled $260,-000 for the years 1976 through 1979.

### 4. *The 1979–1980 Stock Transactions*

In 1979, Dr. Finklestein determined that Mechtron's primary problem was that it was seriously undercapitalized. Dr. Finklestein recommended that Mechtron either bring in equity investors or merge with another corporation. To facilitate a potential merger, Dr. Finklestein recommended that Mr. Pierce reacquire Mr. Krapf's Mechtron stock from the University of Delaware for $10,000. By that time, the Mechtron stock had split ten for one; hence, the University's shares numbered 260,000. The University accepted Mr. Pierce's offer. This amounted to approximately $.04 per share or $.40 per old share.

At this time, Mr. Pierce sold 100,000 shares of this common stock to Dr. Finklestein for the same pro rata price of $.04 per share.

In June of 1980, Dr. Finklestein arranged a sale of approximately 600,000 newly-issued shares of Mechtron common stock to outside investors for $1.00 per share ($10.00 per old share). Dr. Finklestein, himself, took 50 percent of his fee in Me-

chtron stock at $1.00 per share. In addition, Mr. Pierce converted a debt of approximately $288,000 owed to him by Mechtron together with $50,000 cash into roughly 338,000 shares of Mechtron common stock.

### 5. *The Deductions*

The plaintiffs claimed charitable contribution deductions for federal income tax purposes premised upon Mr. Krapf's Mechtron stock having been worth ten dollars a share, a total of $260,000 on the date of the gift. They claimed deductions on their joint individual federal income tax returns in the following amounts for the following years:

| Year | Deduction Claimed |
|------|-------------------|
| 1976 | $ 72,458 |
| 1977 | 56,418 |
| 1978 | 124,274 |
| 1979 | 6,850 |
| | $260,000 |

The Internal Revenue Service audited plaintiffs' returns for those years. The IRS disallowed all deductions for the gift on the grounds that the Mechtron stock was worthless on the date of the gift. As a consequence, the Service assessed the following deficiencies and interest against the plaintiffs:

| Year | Deficiency | Interest |
|------|-----------|----------|
| 1976 | $37,599.00 | $21,731.32 |
| 1977 | 32,611.00 | 16,543.71 |
| 1978 | 68,263.00 | 30,369.28 |
| 1979 | 3,425.00 | 1,266.20 |

The plaintiffs paid the deficiencies on October 14, 1982, and paid the interest on March 11, 1983, and April 5, 1983. On August 8, 1983, plaintiffs filed a claim for a refund of those payments. When that claim was not allowed, this suit was filed.

### Discussion

### 1. *Burden of Proof*

The central question in this case is whether plaintiffs have met their burden of proving erroneous the Commissioner's determination that Mechtron's common stock was worthless as of the date of the dona-

---

presented that Mr. Krapf exercised the preferred stock's contingent voting right at any time.

**3.** Def.Ex. 23, p. 13.

tion. A critical secondary issue, then, is if the plaintiffs have proved the Commissioner's determination erroneous, have they proved an actual value?

Plaintiffs argue that they have satisfied their burden of proof. They argue that because they have satisfied their burden of proof, the burden of persuasion shifts to the defendant. It is their contention that since the defendant has the burden of persuasion, the government must show that the Commissioner's determination was correct. The defendant argues, however, that plaintiffs have not satisfied their burden of proof because they have not proved the exact value of the gifted stock.

 It is a well-established principle of federal tax law that the determination of the Commissioner is prima facie correct. *See, e.g., Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). This presumption operates as a procedural device which places the burden of going forward on the opposing party. *See Arkhola Sand & Gravel*

Co. v. United States, 190 F.Supp. 29 (W.D. Ark.1960).

 The plaintiffs must prove by a preponderance of the evidence that the donated stock was not worthless to show that the Commissioner's determination is erroneous.[4] Plaintiffs have met that burden. First, Mr. Pierce, the government's principal fact witness, stated by letter to Mr. Bowden, an employee the company was encouraging into senior management, that the stock was estimated to be worth $10.00 per share. His attempt at trial to refute that statement in his letter, when asked the question by the court, was not credible.

Second, testimony showed that at the time of the gift, while the company had real problems, it was also a going concern.[5] In 1976 it had real potential of the type that made the stock of value to a reasonable investor, though it certainly was a speculative buy. Third, the government's highly-qualified expert, Mr. Ohanian, clearly testified that the company's serious, economic condition continued to worsen from

4. The plaintiff in a suit for refund has a dual burden. The burden of proof is on the taxpayer to prove that the determination of the tax by the Commissioner was wrong. Moreover, the taxpayer has the burden to produce evidence from which a proper determination can be calculated. *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Roybark v. United States*, 218 F.2d 164 (9th Cir.1954); *Compton v. United States*, 334 F.2d 212 (4th Cir.1964); *Alvary v. United States*, 302 F.2d 790 (2d Cir.1962); *First Nat'l Bank of Miami v. United States*, 235 F.Supp. 331 (S.D.Fla.1964); *David v. Phinney*, 63–2 USTC ¶ 9612 (S.D.Tex.1963), *aff'd*, 350 F.2d 371 (5th Cir.1965); *Peeples v. United States*, 60–1 USTC ¶ 9441 (M.D.Ga.1960); *Arkhola Sand & Gravel Co. v. United States*, 190 F.Supp. 29 (W.D.Ark.1960); *Hodoh v. United States*, 153 F.Supp. 822 (N.D.Ohio 1957); Laurence F. Casey, *Federal Tax Practice* § 11.44 (1984); Smail, 39 Taxes No. 8 (1961); *but see Timken Roller Bearing Co. v. United States*, 66–1 USTC ¶ 9151 (N.D.Ohio 1964) (disagreeing with the contention that a taxpayer has a double burden of proof in a refund suit).

5. The defendant argues that Mechtron is not a going concern because it is insolvent. Notwithstanding, the court determines that on the donation date Mechtron was a going concern. The test for a going concern is not abstract insolvency, but the ability to pay obligations as they become due.

The defendant points to Mechtron's negative working capital (current assets-current liabilities) as evidence of the company's inability to pay obligations. However, the court finds working capital is only one of several factors used to determine whether a company can meet its obligations. The entire financial picture of the company is relevant to determine whether a company is a going concern.

The revenue of the company is the starting place. The revenue of the company gives an accurate picture of whether the company has an adequate cash flow. The record shows Mechtron's sales increased by 40 percent from December 31, 1973, through December 31, 1976. The analysis of this data indicates that Mechtron was able to pay its debts as they became due. First, the company had significant revenues to pay the notes payable, accounts payable, long term debt due within one year, and dividends payable. Second, testimony at trial indicated that Mechtron had successfully "juggled assets" to meet its obligations when it lacked the necessary cash. Third, the record indicated that although Mechtron accumulated $2,000,000 in additional long-term debts since the donation date, it continued to meet its liabilities as they became due. Therefore, the court finds that the company was able to meet its current obligations as they became due on September 2, 1976.

1975, a year before the gift date until bankruptcy in 1981. Yet plaintiffs showed there were knowledgeable investors who were willing to pay $1.00 per share in 1980 ($10.00 per old share), after four years of worsening conditions from the date of the gift. This provides support to plaintiffs' $10.00 valuation in the somewhat "rosier" earlier period. The evidence, however, also shows that at the time of the gift, Mechtron's problems with Amtrak were reaching a serious state. And while this undoubtedly had some negative effect on the stock's value, the outcome of the Amtrak problems was not certain. This only became fully clear after the gift had been made. Further, even the major economic blow dealt by the final loss of the Amtrak contract did not sink the company, which operated for five more years.

Fourth, while the government convincingly demonstrated that the Mechtron book value was nominal, Dr. Finklestein's evidence gave support for the fact that Mechtron's stock value came, like many venture capital situations, from its ongoing operations combined with its potential for a lucrative niche in the market (the so-called window of opportunity that a company like Mechtron could enjoy).

Fifth, the parties disputed the relevance of Dr. Finklestein's factual testimony concerning 1979–1981 conditions of the corporation combined with the 1980 sales of the stock at $10.00 per share. The testimony of principal government expert, Mr. Ohanian, however, supports and in some degree, makes that evidence relevant. Demonstrating that the 1980 condition of Mechtron was economically and in all other respects worse than the September 1976 condition of Mechtron supports the 1980 sales of Mechtron stock as a floor, at the very least, for the 1976 value. Mr. Ohanian honestly confronted this contradiction in the government's case, and the Commissioner's decision, by saying he could provide no explanation, except perhaps the merger possibility. That, of course, is no answer, because if the stock was of value because another company was willing to buy it, then it was of value. That value, of course, has to be measured at the minimum by what those people would pay for it.

Perhaps the most significant piece of evidence for plaintiffs' claim was that the government's only fact witness, Mr. Pierce, who said the company's stock had no value, was willing to pay $338,000 dollars for 338,000 new shares of it in 1980. Thus, it is clear that plaintiffs have met their principal burden of showing that the Commissioner's decision was wrong.

## 2. Evidence of Actual Value

■ The defendant implies that the burden of proof upon the plaintiffs is to prove the exact dollar value claimed for the Mechtron stock, and should the proof vary to any extent from that claim, the plaintiffs must be found to have failed to carry their burden. This implication is not warranted either from the decisions cited in support of it or in common sense. The defendant has referred to the "all or nothing" language of *Edison Int'l v. United States*, 10 Cl.Ct. 287 (1986). In *Edison*, the court stated:

> Notably, throughout the extended trial, plaintiff directed all of its proof to support of a goodwill figure in the full amount of the claimed deduction, thereby adducing no evidence that would substantiate any lesser goodwill value. In short, on the issue of goodwill valuation, plaintiff has uniformly adhered to the 'all or nothing' stance. Accordingly, the teaching of *Eli Lilly & Co. v. United States*, [178 Ct.Cl. 666, 372 F.2d 990] [citation omitted] becomes the relevant determinant of its litigating success or failure.

However, a reading of *Edison* and *Eli Lilly* reveals what the courts in those cases were referring to as the "all or nothing" stances. In each case, it was on the plaintiff's position as to the issues involved, not as to the dollar amount, that the court determined the plaintiffs had taken an all or nothing stance.

*Eli Lilly & Co. v. United States*, 372 F.2d 990, 178 Ct.Cl. 666 (1967), involved a reallocation of profits between the taxpayer and its Western Hemisphere Trade Corporation subsidiary under I.R.C. § 482.

The issue under § 482 was whether a reallocation was necessary to clearly reflect income. Instead of endeavoring to prove that the price clearly reflected income, *Lilly* offered evidence of the legitimacy of the considerations entering into its pricing policy. This was the "all or nothing" position to which the court referred: "In electing simply to defend its pricing policy ... Eli Lilly has failed to meet its difficult burden of proving what it would have charged ... an uncontrolled purchaser." *Id.* at 680, 372 F.2d 990.

The same situation existed in *Edison*. In *Edison*, the taxpayer sought a loss deduction under § 165(a) for good will claimed to have been acquired in 1911. The dollar value asserted for that good will was the amount shown on a 1911 financial statement, which in turn depends upon the fair market value of the Studebaker Corporation in that year, which was said to have been equal to the par value of its stock. In that case, the plaintiff did not rely on the particular value of the good will. Instead the plaintiff relied on the par value of the corporation's stock as being the mathematically determinative factor in computing the good will, as has been done in preparing the financial statement. The court found that the par value did not establish the value of the corporation. Consequently, par value did not determine good will. Since the plaintiff had not offered any other method of valuing good will, the plaintiff failed to prove its case.

The cited cases of *Luce v. United States*, 4 Cl.Ct. 212 (1983), and *Rosenberg v. United States*, 3 Cl.Ct. 432 (1983), contain no discussion of the "all or nothing" concept. In each case, the court found that plaintiff's evidence was insufficient to prove that the tax had been overpaid. In addition to not being supported by the cited authorities, the defendant's "all or nothing" argument must fail as a matter of common sense.

In every valuation case, the plaintiff must assert some figure as being the value of the property in issue. The plaintiff must then submit evidence of that value. If the court then finds from all of the evidence, expert or otherwise, that the correct value was some amount different from the asserted value, under the defendant's position, the plaintiff must lose for failure to meet its burden of proof. However, it follows from the fact that the court was able to determine the value as an amount different from that asserted that there clearly was evidence to support that other amount. If there had been no such evidence, the court would not have been able to determine the different value. Defendant's position would then cause the plaintiff to forfeit its entire claim if plaintiff's evidence proved a value any different than its claim. This approach would resemble the worst defects of pleading under the medieval forms of action at the common law. It is out of step with both common sense and modern litigation which sees the analysis of evidence as a rational process rather than an arcane game. Consequently, the court determines that plaintiffs have proven by a preponderance of the evidence that the Mechtron stock had a determinable worth on the contribution date.

### 3. Valuation of Gifted Stock

This court then must determine the value of a minority interest of common stock gifted by plaintiffs to the University of Delaware. The general rule is that the amount deductible for a charitable contribution made in property other than money is the "fair market value of the property at the time of the contribution." Treas.Reg. § 1.170–1(c)(1). Fair market value is the price at which the property would change hands in a transaction between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both having reasonable knowledge of the relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716–17, 36 L.Ed.2d 528 (1973); *Arc Realty Co. v. Commissioner*, 295 F.2d 98, 103 (8th Cir. 1961); *O'Malley v. Ames*, 197 F.2d 256, 257 (8th Cir.1952); *Angell v. Commissioner*, 52 T.C.M. (CCH) 939 (1986); Ann., *Amount Deductible for Property Contributed to Charity Under § 170 of Internal Revenue Code of 1954 (26 U.S.C. § 170) as Affected by Nature of Property or Form of Contri-*

bution—*Current Cases*, 40 A.L.R.Fed. 192 (1978).

Plaintiffs argue the fair market value of the stock is $10.00 per share. As support for this value, plaintiffs point to several stock transactions between 1971 and 1980. Defendant argues, however, that the fair value of the stock is zero. Defendant bases its argument on the company's balance sheet and the loss of the Amtrak contract. The court recognizes that ascertaining the fair market value of closely held stock is a difficult problem. *See Central Trust Co. v. United States*, 305 F.2d 393, 158 Ct.Cl. 504, 514 (1962). Moreover, it is never possible to fix the value of unlisted corporate stock in a closely held corporation with scientific accuracy, and the court is required to do so.

Fair market value is a question of fact to be determined by an examination of the entire record. *Skripak v. Commissioner*, 84 T.C. 285, 320 (1985). There is no single formula universally applicable in determining such value. In the absence of evidence of an open market for stock, it is proper to consider all of the circumstances connected with the corporation in determining its fair market value. *O'Malley v. Ames*, 197 F.2d 256 (8th Cir.1952). Fair market value of unlisted stocks can be determined by examining actual sales made at arm's length in the normal course of business. These sales must be for reasonable monetary value and within a reasonable time before or after the valuation date. *Estate of Fitts v. Commissioner*, 237 F.2d 729 (8th Cir.1956). Even where stocks are unlisted, actual sales may be available to determine value. Absent such sales, however, the corporation must be evaluated according to financial and physical circumstances at the time of the gift. The purpose remains to find the value a purchaser would have paid in a fair and free market.

Section 20.2031(f) (as amended by T.D. 7312, 1974–1 C.B. 277) of the Estate Tax Treasury Regulations and § 25.2512(f) of the Gift Tax Regulations provide that where selling prices or bids and asked prices are not available, fair market value is to be determined by taking into account factors a willing buyer or seller would need to make an informed decision. The regulations enumerate these factors: assets, earnings, earning potential, history of dividends, book value, character of management, competition, and "other factors". Estate Tax Treas.Reg. § 20.2031(f); Gift Tax Reg. § 25.2512–2(f); *Estate of Fitts v. Commissioner*, 237 F.2d 729, 731 (8th Cir. 1956).[6] Rev.Rul. 59–60, 1959–1 C.B. 237 echoes these factors and discusses the significance to be attached to them. It also provides the use of profit and loss statements for the five years ending with the valuation date. No one factor is determinative. While the factors cannot be determined with formulaic precision, the weight given to each must be tailored to account for the particular facts of the case. *Estate of Andrews v. Commissioner*, 79 T.C. 938 (1982).

### 4. Primary Ways to Determine Value of Stock

This court must determine the value of a minority interest of common stock in a closely held corporation. The effort to value stock begins with the premise that sales are the best indication of fair market value. *See Hermes Consol. v. United States*, 14 Cl.Ct. 398 (1988). However, if the sales are not freely made at arm's length, the sale is not an accurate indication of value. Absent reliable stock transactions, the court must examine the financial condition of the corporation at the time of the donation to determine value. The next section will examine actual transactions involving Mechtron common stock. Subsequent sections examine traditional means of financial

**6.** For a thorough discussion of the methods used and relevant factors considered in determination of value, *see generally* Ann., *Valuation of Closely Held Stock for Federal Estate Tax Purposes Under § 2031(b) of the Internal Revenue* *Code of 1954*, 26 U.S.C. § 2031(b), *and Implementing Regulations*, 22 A.L.R.Fed. 31 (1975). Kahn, *Appraisals for Charitable Contributions of Non Cash Property*, 64 Mich.B.J. 67 (1985).

analysis to determine the value of the stock.

### 5. Mechtron Stock Transactions

█ Stock transactions that took place before the donation are the initial capital investment, the alleged buy-sell agreement, the employee stock purchase, and the donation. These transactions are not indicative of the value of Mechtron common stock. In 1971, three investors including plaintiffs received 26,000 shares of Mechtron common stock for a $15,000.00 investment. The initial capital investment by the top officers of this corporation is not an accurate indicator of the value of the shares. Mr. Krapf testified that in setting a value for the stock, the original investors did not analyze financial data or consult experts on valuation. They assigned a value based on "their experience as venture capitalists." The transaction is controlled by those receiving the stock. In other words, the buyers were also the sellers. This transaction cannot be used to arrive at a fair market value.

### A. Buy–Sell Agreement

█ Plaintiffs argued that an executed buy/sell agreement, purportedly signed by the three original founders of Mechtron, pegged the price at $10.00 per share. The court finds, however, that this argument is unpersuasive. Plaintiffs' position at the administrative level is markedly different than their position before this court. At the administrative level the plaintiffs argued in their claim for refund that the buy-sell agreement remained unexecuted because of the unexpected death of one of the shareholders. Def.Ex. 24, p. 5.

At trial the plaintiffs proffered evidence that the buy-sell agreement was executed. Under the doctrine of factual variance, the court lacks jurisdiction to consider the buy-sell agreement as executed. *Aetna Life Ins. Co. v. United States*, 16 Cl.Ct. 364 (1989). At trial, the plaintiffs were unable to establish whether this document was ever executed. The only evidence produced by the plaintiffs to support the existence of this agreement was Mr. Krapf's testimony. Mr. Krapf's testimony, however, was not consistent with his earlier statements on this subject. Moreover, Mr. Pierce convincingly testified that the buy/sell agreement was never executed. But even if the court were to believe Mr. Krapf, and disbelieve the testimony of Mr. Pierce on this point, the purported decisions of the parties to the agreement to destroy it before the time of the gift tends to negate any inference of value from that much-discussed, but missing, document.

### B. The Employee Stock Transactions

█ Plaintiffs rely upon the payment of $10,000.00 by Mechtron to Robert Engler in exchange for his 1,000 shares of Mechtron common stock in March 1975. This reliance is misplaced, however, for several reasons. First, the payment to Mr. Engler appeared to be based in large part on the value of the work he did for Mechtron, not the value of the stock. Second, the personal relationship between Mr. Engler and the officers of Mechtron was such that the transaction was not at arm's length.[7] Third, the record reveals that the directors of Mechtron did not undertake valuation when making the offer to repurchase the

---

**7.** Plaintiffs cite *Capital City Excavating v. Commissioner*, T.C. Memo 1984–193, as support for its position that stock sales to employees can be used to determine the value of stock. However, *Capital City Excavating* is not dispositive on this issue. In *Capital City Excavating*, the Tax Court did not use the employee sales to establish a value for the stock. The only relevance of the stock transactions in the court's reasoning was to show the inconsistency in the government's position. Consequently, the court stated:

> It is true that these sales, while not compulsory, are not arm's-length transactions in that they are sales to insiders who might be in a

position to influence price. This fact cuts against respondent's own position, however: insider sales are normally suspect in that prices may be artificially *low* in deference to officers, directors, or key employees; the perceived danger in the instant case is just the opposite, i.e., that the price paid by the ESOP was too *high*. It is irrational to suggest that the lack of arm's-length bargaining in this instance worked to the disadvantage of the ESOP. If it had any influence at all, it would only have been to decrease the price which the ESOP paid to petitioner.

stock held by Mr. Engler. Fourth, in March 1975, the devastating threat of loss of the Amtrak business had not yet materialized, which certainly would have some effect on the stock's value. *See Estate of Fitts v. Commissioner*, 237 F.2d 729, 731 (8th Cir.1956); *Righter v. United States*, 439 F.2d 1204, 194 Ct.Cl. 400, 409–10 (1971); *Central Trust Co. v. United States*, 158 Ct.Cl. at 519, 305 F.2d at 400; *Hermes Consol. v. United States*, 14 Ct.Cl. at 409. For the same reasons, Mechtron's 1975 sale of stock to Mr. Engler's replacement, Roderick Bowden, for $10.00 per share is not determinative in valuing the stock.

## C. *Post–Gift Transactions*

The plaintiffs argue that post-gift transactions establish the stock had a value of $10.00 per share. Notwithstanding, defendant argues that post date of gift evidence is irrelevant in determining the value of the gifted stock.

▌ The Claims Court has consistently held that the valuation of closely held stock must be made without reference to events which occur after the date of the gift. *Fehrs v. United States*, 620 F.2d 255, 223 Ct.Cl. 488, 506 n. 6 (1980); *Estate of Ridgley v. United States*, 180 Ct.Cl. 1220, 1237–39 (1967); *Central Trust Co. v. United States*, 305 F.2d 393, 158 Ct.Cl. 504, 520 (1962); *Grill v. United States*, 303 F.2d 922, 157 Ct.Cl. 804, 812 (1962); *Hermes Consol. v. United States*, 14 Ct.Cl. at 415 n. 28; *see also Bader v. United States*, 172 F.Supp. 833, 84 (S.D.Ill.1959); *Estate of Wilson v. Commissioner*, 23 T.C.M. (CCH) 87, 90 (1964). Generally, post date of the gift evidence is irrelevant because such information "would not have been available to a prospective purchaser" on the valuation date. *Central Trust*, 158 Ct.Cl. at 520. However, two exceptions to this rule arise. First, post gift data can be used in valuation when there has been no material change of circumstances or conditions in the corporation between the valuation date, in this case the date of gift, and time of post-valuation date information. Second, the post-gift evidence is indicative of date

of gift value when the subsequent information could have been foreseen on the valuation date. *Estate of Ridgley*, 180 Ct.Cl. at 1237–38.

▌ Defendant argues that plaintiffs have not satisfied their burden about whether the post-gift transaction was foreseeable on the date of gift. The court agrees with defendant that plaintiffs have not carried their burden. The plaintiffs offered no evidence on this point, nor does the record contain any evidence which persuades this court to find otherwise.

Defendant further argues that between the time of the gift and the post-gift transactions, the company experienced a material change in circumstances. As support for its position, defendant points to the loss of the Amtrak contract, the hiring of Dr. Finklestein, and an accumulation of $2,000,000 in additional losses by the company.

Notwithstanding this the court is unpersuaded that these facts are material changes. The court notes the company continued in the same business of steel structural refabrication. Although the loss of the Amtrak contract did affect the amount of revenue the company made, the overall structure of the company was unchanged. Moreover, the working capital ratio taken from the balance sheet date showed continued decline. Furthermore, the company continued to accumulate debt, which at the time of 1981 was an additional $2,000,000. Finally, the hiring of Dr. Finklestein, a management consultant, in no way marked a change in management governance or corporate policy, nor did it insure the success of Mechtron. Thus, the post-gift transactions occur during a period of relatively steady and continuing decline between the date of the gift and the final bankruptcy. They provide cogent evidence of value for the stock at the time of gift, at least as a floor. It is a highly rational and persuasive inference that if something is worth $50.00 when the market for it is bad, then it must have been worth more when the market was better, all other things being equal. The court is convinced from the government's own evidence that this was the case here. The only relevant

change in the financial condition of Mechtron between the gift date and the 1979–1980 stock transactions was a general decline.

### D. *The 1979 Transactions*

■ The plaintiffs dismiss as irrelevant a 1979 transaction in which the University of Delaware sold 260,000 shares of the donated stock to Mechtron for $10,000 or $0.04 a share for the post-split stock. As part of this transaction, Mechtron then sold Dr. Finklestein 100,000 shares of this stock for the same per share price.

Plaintiffs explained the low price of the stock in the University–Mechtron sale as a fluke somehow caused by student unrest at the University. By doing this, they seek to destroy any "fair market" quality the sale may have had. Plaintiffs did not establish the presence of unrest or the causal connection between it and the sale. Plaintiffs failed to introduce any testimony from anyone at the University to shed light on this matter. Only extremely vague testimony by Dr. Finklestein addressed the issue of price. However, this testimony never explained the unrest in detail or the University's decision to respond to the unrest by virtually giving away allegedly valuable and noncontroversial stock. The court cannot consider unsubstantiated allegations that undermine the "fair market" aspect of the transactions by insinuating that the University was compelled to sell. However, the government failed to provide any support for this sale being a fair market value of the stock in 1976 or 1979. The fact that the University acquired the stock as a gift and was not in the business of stock speculation also undercut this transaction's determinative quality.

### E. *The 1980 Transactions*

As support for their position that the donated stock's value is $10.00 per share, plaintiffs point to the 1980 stock placements to Messrs. Pierce, Finklestein, and outside investors. The court finds only the stock placement to Mr. Pierce represents the actual value of the donated stock on September 2, 1976. Mr. Pierce was clearly the most knowledgeable party concerning this company as one of its three founders, its president for virtually its entire history, and its chief operating officer. He was willing to pay $50,000 cash for stock at a time when the balance sheets showed the corporation's condition was worse than when the gift was made. This came to $1.51 per old share.

However, he also cancelled debts owed to him by the company totalling $8.49 per share. These debts must be significantly discounted in light of Mr. Ohanian's testimony. The court deems that valuing these debts at 33.3 percent of their face value would be fair in light of all of the evidence. Arguing for a lower value is Mr. Ohanian's credible testimony of the dire straights of the company and the potential effects of Mr. Krapf's preferred stock claims. Dr. Finklestein's credible testimony, however, suggests a higher value then 33.3 percent is appropriate. The court discounts the cancelled debt owed to Mr. Pierce by 33.3, which is $2.83 per share. The sum of Mr. Pierce's stock transaction, $1.51 in cash, and $2.83 in debt collection results in a value of $4.34 per original share. This the court finds to be the actual fair market value on September 2, 1976.

About the knowledgeable investors brought in by Dr. Finklestein, there was far too little evidence to provide a conclusive basis for setting a $10.00 value on the stock. Although Dr. Finklestein's testimony explained in detail the Security and Exchange Commission rules for investing in over-the-counter stock, this court is not persuaded these investors were knowledgeable. The plaintiffs have the burden and could easily have satisfied their burden by submitting an investor's form or testimony.

Finally, the court is reluctant to give conclusive weight to Dr. Finklestein's stock transaction where he received stock in exchange for a 50 percent waiver of his fee. The court finds it would be speculative to assign this stock a value of $10.00 per share, especially since plaintiffs did not offer any evidence of Dr. Finklestein's compensation as an employee.

### 6. Financial Analysis of Mechtron

■■■■■ The defendant submitted three expert opinions that referred to three traditional methods of financial analysis to determine value. Absent reliable corporate stock transactions, the principal methods to estimate the fair market value of closely held capital stock are discounted cash flow analysis, comparable company analysis and adjusted net worth analysis. The plaintiffs did not submit expert reports; however, Dr. Finklestein testified in the capacity of an expert financial consultant for developing corporations. Although the data provided is extremely helpful, the court is not bound to accept the opinions of these experts because it finds Mr. Pierce's 1980 stock transaction to be an actual sale.

■■■■■ The court notes, however, that the opinions of experts are helpful and should not be arbitrarily ignored. However, expert opinions, like any other judgments, are no better than the arguments stated in support of them, and do not bind the trier of fact, whose responsibility it is to determine value from all of the evidence, expert or otherwise. *Helvering v. National Grocery*, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); *Gloyd v. Commissioner*, 63 F.2d 649, 650 (8th Cir.1933); *Campbell v. United States*, 661 F.2d 209, 228 Ct.Cl. 661 (1981). The court will address these traditional approaches because at least one, the net worth approach, parallels the court's analysis of the 1980 Pierce sale.

In estimating the value of Mr. Krapf's gift, the defendant focused primarily on the comparable company and the adjusted net worth analyses. Def.Exs. 12, 13, and 14. It concluded that the discounted cash flow analysis was unacceptable because the company had an extremely poor cash flow situation. Noting an absence of earnings

on an adjusted basis for the three years ending December 31, 1977, it determined the value of the gifted stock was zero by using both remaining valuation methods.[8] Def.Ex. 13, p. 23. The comparable company and adjusted net worth methods of financial valuation are discussed below.

#### A. Comparable Company Analysis

The comparable company and adjusted net worth approaches are similar in that both examine the financial condition of the corporation being valued in order to determine price per share. In the comparable company analysis, the company is evaluated to determine its industry price-earnings multiples, dividend yields, and book value ratios. These figures are compared to those statistics of publicly traded corporations of a similar size and line of work. The worth of the corporation being valued is estimated in relation to the value of the publicly traded stock of the other corporation. The accuracy of this method depends on finding a publicly traded corporation that is, in fact, comparable to the non-publicly traded one.

Plaintiffs argue that traditional methods of valuation other than stock transactions cannot be used to value start-up companies. Those companies usually have not experienced earnings, have not the capacity to pay dividends in the years preceding the valuation date, or have a negative asset or book value in the valuation years. *Estate of Skouras*, 44 T.C.M. (CCH) 1496 (1982).

Plaintiffs use two cases, *Gatlin v. Commissioner* and *Estate of Skouras*, to attack the traditional financial methods evaluating corporate worth. However, these cases question the use of only one of those traditional methods, the comparable company analysis, in the context of evaluating a unique venture capital corporation.[9] Rely-

---

8. Defendant offered three valuation reports as evidence of the value of Mechtron's stock. Two of these reports gave a value for Mechtron as of March 8, 1977. Def.Exs. 13 and 14. The third report valued Mechtron as of September 2, 1976. Def.Ex. 12. This court determines the data in all three reports have been useful in assisting this court in determining the value of the Mechtron stock. However, the opinions expressed in them were contrary to the weight of

the evidence presented at trial and must be rejected.

9. A venture capital company is a high risk investment with a substantial upside potential. The value of such a company is based on its concept and its ability to translate that concept into growth in earnings and revenues, rather than on the basis of earnings stability or a predicted income stream. The parties agree

ing on *Gatlin v. Commissioner*, T.C. Memo. 1982–489, 44 T.C.M. (CCH) 945 (1982), the plaintiffs argue that "the use of traditional valuation methods to value the stock of venture capital businesses with great potential is inherently flawed." *Gatlin* at 952. Plaintiffs' reliance on *Gatlin* is misplaced. *Gatlin* does not stand for the proposition that all the traditional methods of valuation are inherently flawed in evaluating a venture capital business. In *Gatlin*, the IRS disallowed charitable donations of stock in a medical examination company because the value was zero. The Tax Court relied upon the change of circumstances in the corporation between the date of an early public stock offering and the donation date to determine the value of the stock. The Tax Court found that the comparable company evaluation was inappropriate for a unique venture capital corporation because the IRS expert did not use companies comparable to the one in question to make its determination. In this and many other venture capital valuation cases, there were no publicly traded companies comparable to the one being evaluated.

The court finds that *Skouras* does not support plaintiffs' position. The Tax Court determined that comparable companies were few. Extrapolations based on such a small sample would render the comparative results inaccurate. The court held that the comparable company valuation approach was flawed because no reliable comparable companies existed from which to gather financial data for a reliable determination of value. The court, thus, determined that substantial weight should be given to the circumstances of the company being evaluated as opposed to the comparable company valuation method. *Gatlin* and *Skouras* do not address the other traditional means of valuation, but they do question the extent to which a court should rely on the comparable company analysis in valuing a particular venture capital company.

Mechtron was in a unique position in the railroad car market. It was one of the very few companies refurbishing such cars. Although Mechtron had competition at that time, those companies cannot be used in a comparison because they were not publicly traded.

Moreover, the comparable companies found in the report of the expert witnesses are suspect. Mr. Bard testified, "I couldn't find any companies that were in a business of refurbishing railroad cars." Tr. 283. He, therefore, used as his comparable, companies that show movies on airplanes, or operated animal theme amusement parks or other totally unrelated, but, in his opinion, equally unique businesses. The court notes, however, that Mr. Bard's analysis comparing unique businesses is like comparing apples and applications. They may sound alike, but any similarity is highly subjective. Therefore, the court finds his analysis here unpersuasive.

Mr. Ohanian testified that he also considered the comparable companies approach. However, the comparable companies approach was adversely affected by insufficient cash which resulted in the earnings and liquidity ratio comparing unfavorably to other companies. The court finds Mr. Ohanian's analysis flawed because his income analysis did not adjust for the disruption caused by the 1974 move from the Bancroft to the Shaw plant. Additionally, the court finds suspect Ohanian's averaging of income approach which failed to weigh Mechtron's income for five years as required by Revenue Ruling 59–60. Thus, the court finds that the companies used in the defendant's comparative analysis do not give a reliable indication of the value of Mechtron's common stock.

### B. *Adjusted Net Worth Analysis*

The adjusted net worth approach is another means of valuation that focuses on

---

that, during the period of 1971–81, Mechtron most closely resembled the business operations and nature of a venture capital company in the start-up stage. There are generally considered to be five different stages of financing for venture capital companies: (1) start-up; (2) first stage financing; (3) second stage financing; (4) third stage financing and (5) buy out acquisition financing. *See generally* S. Rubel, "Venture Capital Investments" in *I Financial Analysts Handbook*, ch. 18, p. 499 (S. Leving 1975).

the financial outlook of the company. In the context of the adjusted net worth analysis, plaintiffs argue that Mechtron was in the venture capital market from 1971 through 1981 and that Mechtron should be appraised "on the basis of venture capital, meaning with regard to the expectations of future earnings of the business." Pls.Br. at p. 30. The government argues that a valuation approach that completely disregards actual earnings and conditions of the corporation by looking solely to the suppositions regarding the future potential should be rejected. Reply Br. at p. 4.

The court is not convinced that plaintiffs' method, which avoids scrutiny of unfavorable circumstances at Mechtron during the time of the gift, correctly reflects the value of Mechtron stock. This court recognizes the possibility of a venture capital market. However, the court finds that the venture capital approach utilized by the plaintiffs in evaluating Mechtron's common stock is flawed because it completely disregards the importance of actual earnings as a factor in the assessment of future expectations. This court in *Fehrs v. United States*, 620 F.2d 255, 223 Ct.Cl. 488 (1980), explained:

> [T]o be sure, prospective earnings are important in determination of a share price. However, a valuation that completely disregards the recognized importance of actual earnings as a factor in the assessment of future expectations, ... must rest on something more than the naked speculation that a dramatic change in corporate fortunes would follow a change in corporate management.

*Id.* at 508, 620 F.2d 255 (citations omitted).

Valuation of a venture capital corporation is a fact-intensive study of the conditions and circumstances of the corporation at the valuation date. Potential earnings or performance of the corporation cannot be estimated without understanding the economic and organizational foundation upon which the corporation is built. In this case, the court is determining the value of a minority interest of stock in a closely-held corporation. In such a case, the nature of present circumstances is a compelling factor to be considered because the buyer presumably will not be able to gain control of the corporation and make changes in the existing management and business methods.

■ The defendant used the adjusted net worth analysis to find that the Mechtron stock had no value. The basic formula used to calculate net worth subtracts liabilities from assets. This analysis has two sub-categories of evaluation. In the first method, the premise is that the corporation is no longer a going concern and should have been liquidated at the time of the gift. The expert finds the liquidated value of the corporation by subtracting the assets from liabilities. This method discounts the assets because it is assumed they will no longer be in use and there will be liquidation costs. The court finds that Mechtron was a going concern at the time of the gift; thus, this method used by defendant's experts is not really applicable.

■ The second sub-category method of evaluation under the adjusted net worth analysis is going concern value. This method assumes the corporation will remain in business indefinitely. The assets are valued higher because they will be in continued use and there are no projected liquidation costs. Assets include intangibles such as goodwill and market share because the corporation will remain in business.

Because the expert opinions do not consider Mechtron a going concern, their conclusions of value are not determinative in the analysis of the stock's value. However, their financial data regarding Mechtron was undisputed by the plaintiffs. The net value of a going concern is determined by subtracting assets from liabilities. In this calculation, the assets include fixed assets, tangible assets, intangible assets, and net working capital. The liabilities are comprised of long-term debt. The defendant's expert estimated that the fair market value of plaintiffs' assets was $2,500,000.00. Def.Ex. 13, p. 14. Tangible assets include the $158,147.00 tax credits and loss carryovers. Remarkably, al-

though plaintiffs argued that Mechtron was a going concern, they did not attempt to establish an intangible asset value. Considering the corporation's difficulties described earlier in this opinion, the court will not speculate as to such value. Net working capital totaled $384,973.00. Total assets were $2,273,174.00. Total long-term debt was $2,170,172.00. In this formula, the net worth of Mechtron in 1976 was $103,002.00. One third of this, reflecting that the 26,000 shares equalled one third ownership of Mechtron, is $34,334.00, or $1.34 per shares donated. *See* Appendix A. Figures from Def.Ex. 13, p. A–1 and A–2.

The experts for the defendant make much of unverified inventory figures for end of 1975 and beginning 1976. Because this particular formula, taken from defendant's exhibit 13, page 13, does not represent the inventory as an asset or liability, the defendant should not be uncomfortable with its application.

Mr. Krapf cannot expect to get the proportional share of the corporate asset value for these shares. A minority interest in a closely held corporation is not worth the book value because the purchaser does not have the power to effect change in the corporation. The minority shareholder in a closely-held corporation cannot elect directors to the board, declare dividends, control assets in any way, or sell his shares on a ready market. Additionally, the common stock in this case was worth less because preferred stockholders had overriding rights and power regarding the composition of the board of directors. The unfavorable condition of management and facility are also a factor. Considering these drawbacks and restrictions, this court dis-

counts the book value of $1.34 by 33.3 percent. The value of the stock after discount is $.92 per share.[10] The court notes that the value of $.92 a share clearly shows the stock is not worthless. Moreover, this value does not include a value for good will and market share. If good will and market share are assigned a value and this value is added to the $.92 a share, the final value would be comparable to the court's finding of $4.34 a share.

### Conclusion

This court finds that plaintiffs have shown that the decision of the Commissioner to disallow the charitable deductions was in error or incorrect. Also, the court determines that plaintiffs introduced evidence of actual sales which show the actual value of the donated stock on September 2, 1976, was $4.34 a share. Therefore, the value of the stock was $112,840 on the donation date. It is found and concluded that plaintiffs are entitled to a deduction for that amount.

The parties are directed to file a joint status report within sixty days in order to notify the court of the need for any further proceedings and to resolve any issues that may remain in this case.

IT IS SO ORDERED.

10.

| ASSETS | | |
|---|---|---|
| Fixed assets- plant, property, and equipment | $2,500,000.00 | |
| Tangible assets- tax credits and loss carryovers | 158,147.00 | |
| Intangible assets- goodwill and market share | 0.00 | |
| Net working capital | (384,973.00) | |
| TOTAL ASSETS | | $2,273,174.00 |
| LIABILITIES | | |
| Long term debt- | $2,170,172.00 | |
| TOTAL LIABILITIES | | $2,170,172.00 |
| ADJUSTED NET WORTH | | $ 103,002.00 |